**Michael SITA and Beverly Sita, Plaintiffs,**

v.

**DANEK MEDICAL, INC., Respondent.**

**No. Civ.A. 95–3630(DGT).**

United States District Court, E.D. New York.

March 29, 1999.

---

ties' stipulation, the Court declines to exercise supplemental jurisdiction. *See* 28 U.S.C. § 1367(c)(3).

David A. Vesel, Raleigh, NC, for plaintiff.

Gabirini & Scher, P.C., New York City, Pepper Hamilton LLP, New York City, for defendant.

## MEMORANDUM AND ORDER

TRAGER, District Judge.

This is one of two thousand actions filed by five thousand plaintiffs nationally against the makers of surgical screw systems used by orthopedic surgeons in certain types of spinal surgeries. The plaintiffs here are Michael Sita ("Sita"), now 57 years old, and his wife, Beverly Sita. Sita alleges claims of per se negligence arising out of alleged violations of 21 U.S.C. § 301, strict products liability, fraud, negligent

misrepresentation, breach of express[1] and implied warranties, negligent infliction of emotional distress, and conspiracy to defraud. He seeks compensatory and punitive damages as well as equitable relief. Mrs. Sita seeks monetary damages for loss of consortium. Defendant has moved for summary judgment on all claims.

### Background

### (1)

Plaintiff Michael Sita has suffered from severe back and leg pain since 1987 when medical examination revealed bulging discs at the L3–4 and L4–5 vertebrae. Sita's complaints of radiating lower and upper back pain and of back spasms continued into 1990 when an MRI of Sita's lumbar spine confirmed the presence of desiccated and bulging discs at both the L3–4 and L4–5 vertebrae. In 1991, Sita complained of numbness and burning in his back and right leg.

In May 1992, Sita aggravated his back condition in a work-related accident when he was injured by a runaway golf cart at the Nassau Country Club while attempting to stop it. As a result of his on-the-job accident, plaintiff sought worker's compensation. When he first saw a doctor two weeks after the 1992 accident, he was unable to stand due to severe pain and numbness in his back and legs. By June 1992, plaintiff was able to walk with a cane, but did so with a severe limp. In August 1992, Sita reported spasms, pain in his head, neck, back, right arm, hand, leg, knee and foot, numbness in his leg and foot, and difficulty walking, bending, sleeping, lifting and moving.

Starting in July 1992, plaintiff underwent a course of physical therapy. According to the records of plaintiff's physical therapist, aspects of that therapy only aggravated Sita's condition, while the remaining treatments did not appear to alleviate Sita's pain. Def. Aff. in Supp. of Summary Judgment, at Exh.A. On September 1, 1992, Sita expressed to his physical therapist that "I have had no relief [from] physical therapy. Surgery is my only answer." Rec. of Physical Therapy, dated 9/1/92. His severe pain prompted an emergency room visit to North Shore University Hospital on September 9, 1992. At that time, he could "barely" walk and was admitted to the hospital. *See* North Shore Univ. Hospital Discharge Summary, dated 9/19/92.

In December 1992, Sita came under the care of Dr. Arthur Weber, now deceased, who was an orthopedic surgeon affiliated with New York Spine Specialists in Lake Success, New York. On Sita's first visit to Dr. Weber, Sita described numbness in his right leg which "almost never" went away. Rec. of Pl. Visit to Dr. Weber, dated 12/3/92. Initially, Dr. Weber prescribed a course of non-surgical treatments that included the use of non-steroidal anti-inflammatory medications and lumbar body support. *See id.* This treatment, however, proved to be ineffective. Dr. Weber then ordered an EMG, the results of which suggested a right radiculopathy of the L3–4 vertebrae. He linked plaintiff's symptoms to the L3–4 disc (and a suspected L4–5 degenerative disc) which was "exquisitely painful" on discogram. Rec. of Pl. Visit to Dr. Weber, dated 2/23/93. These tests convinced Dr. Weber that fusion surgery from the L3 to the L5 vertebrae was appropriate.

On May 7, 1993, Dr. Weber performed instrumented spinal fixation surgery at the Long Island Jewish Medical Center, during which he implanted components of the Texas Scottish Rite Hospital ("TSRH") Spinal System in Sita's spine. The TSRH System, distributed by defendant Danek, consists of screws, hooks, rods, transverse traction devices, connectors, and other

---

1. Plaintiff's breach of express warranty claim was dismissed after plaintiff failed to advance evidence, as required by PTO 651, 1996 WL 900339, to establish what the warranty was and how it was breached. *See In re Orthopedic Bone Screw Products Liability Litigation,* 1998 WL 118060, MDL 1014 at *12 (E.D.Pa. January 12, 1998) (PTO 1235).

components that allow surgeons to customize constructs. Its purpose is to immobilize the spine while bone graft material placed between the affected vertebrae grows together. to form a solid, bony fusion. Dr. Weber used a surgical technique called "pedicle fixation" to attach the TSRH construct to Sita's spine with six screws in the pedicles of the L–3 to L–5 vertebrae. *See* Long Island Jewish Medical Center Rec. of Operation, dated 5/7/93. The "pedicles" are the two rearward facing bony arches on either side of the vertebral body that support the lamina. *See Dorland's Illust. Med. Dictionary*, at 1819 (28th ed.1994) (diagram of vertebra).

Within days of the surgery, Sita had a "dramatic relief of symptomology" and the TSRH construct was holding his spine "rigidly and firmly." Rec. of Pl. Visit to Dr. Weber, dated 5/18/93. Two months later, x-rays revealed "excellent positioning of hardware and good evidence of fusion." Rec. of Pl. Visit to Dr. Weber, dated 7/15/93. However, approximately three months after the surgery, plaintiff began complaining of aching pain and discomfort, whereupon Dr. Weber advised plaintiff that "the bone graft would take approximately one year to heal." Rec. of Pl. Visit to Dr. Weber, dated 8/5/93. Dr. Weber subsequently determined that, due to plaintiff's weight (between 185 and 200 pounds), an additional anterior (front) spinal surgery would be necessary to support plaintiff's back and alleviate his discomfort. *See id.* While some patients need only a single posterior surgery, in persons weighing 200 pounds or more, a second, anterior surgery is generally required. *See id.*

On November 8, 1993, plaintiff underwent an anterior spinal fusion. This procedure did not make use of the TSRH or any other Spinal System. At subsequent visits to Dr. Weber on January 13 and February 10, 1994, plaintiff offered no specific complaints of pain. On plaintiff's visit to Dr. Weber on March 10, 1994, plaintiff complained of "some mild back discomfort." Rec. of Pl. Visit to Dr. Weber,

dated 3/10/94. X-rays of plaintiff's spine taken on that day (10 months after Sita's initial surgery) indicated that one of the TSRH screws had fractured. Dr. Weber observed that even though the screw had fractured, the bone graft remained in position and, as long as the graft healed, the broken screw "[would] not be much of a problem." Rec. of Pl. Visit to Dr. Weber, dated 3/10/94.

At plaintiff's following visit, a little more than a month later, Dr. Weber noted that he thought that plaintiff was "unduly concerned about the broken screw." Rec. of Pl. Visit to Dr. Weber, dated 4/7/94. On May 5 and June 1, 1994, Dr. Weber noted that despite continued complaints of pain and discomfort in Sita's lower back region, the bone graft from plaintiff's first surgery had gone on to fuse. As of August 4, 1994, the bone graft from the second surgery had not yet fused, though Dr. Weber expected that it would.

In September 1994, Dr. Weber had a long discussion with Sita about the fact that Sita wanted to join a class action suit against the makers of spine screws. At plaintiff's next visit on November 10, 1994, plaintiff began to complain of additional symptomatology. Dr. Weber noted that, in light of the lawsuit, plaintiff's new complaints appeared to be subjective and expressed concern that, as a result of plaintiff's involvement in the lawsuit, "everything [was] becom[ing] tainted." Rec. of Pl. Visit to Dr. Weber, dated 11/10/94. Dr. Weber informed Sita that his complaints were "not a consequence of the hardware or anything else," but rather were the result of the difficulty his own body was having in healing bone. *Id.* On November 23, 1994, Dr. Weber concluded that while plaintiff had some "intermittent pain and discomfort on his low back region," much of that pain and discomfort was "due to inactivity." Rec. of Pl. Visit to Dr. Weber, dated 11/23/94. Dr. Weber advised Sita that he should return to some form of work, something plaintiff had been unable to do since his accident,

but that he could not do heavy lifting. Sita, however, did not return to work.

In connection with his worker's compensation claim, plaintiff sought the medical opinion of Dr. Seymour Einhorn on May 16, 1995. Dr. Einhorn stated that "[o]ne could not tell whether there was any fusion at [the L3–4 and L4–5] levels on x-ray." Einhorn Letter, dated 5/16/95. Dr. Einhorn noted numerous complaints of pain and diagnosed "post multilevel degenerative disc disease" and, despite his earlier finding that one could not tell whether fusion had occurred, Dr. Einhorn diagnosed pseudarthrosis (non-union or the failure of bone to fuse) at multiple levels of the lower lumbar spine. At that time, Dr. Einhorn did not, in any way, indicate that the TSRH instrumentation was a cause of plaintiff's pain. At plaintiff's or his counsel's request, however, Dr. Einhorn examined plaintiff again on September 25, 1997, and reviewed plaintiff's existing medical records. Upon review of those records, Dr. Einhorn concluded that "the broken pedicle screw is a contributing factor in the patient's pain and neurological impairment, as well as causing the fracture of the corresponding pedicle resulting in additional associated complications and impairment." Einhorn Letter, dated 9/29/97.

Dr. Martin Lehman, plaintiff's treating physician since January 1995, stated that Sita's current problems "followed injuries sustained at work." Lehman Letter, dated 1/10/95. Dr. Lehman, describing x-rays of plaintiff's lumbosacral spine, repeatedly referred to "the area of fusion" suggesting that the the bone graft from the first surgery had, in fact, fused. *See* Lehman Letters, dated 1/10/95—1/3/97.

In November 1995, another orthopedic specialist, Jean–Jaques Abitbol, M.D., examined plaintiff on behalf of the Worker's Compensation Board.[2] Dr. Abitbol noted that the area where the TSRH construct was located was "completely healed" and that the components of the TSRH System remained in good position. Abitbol Medical Rec., dated 11/3/95. Fusion had not, however, occurred on the anterior (front) of the spine, where TSRH instrumentation was not used.

### (2)

Defendant Danek's TSRH System utilized in plaintiff's surgery was accompanied by a package insert that detailed the specific risks of fusion surgery, including: "non-union (or pseudarthrosis)," "bending, loosening and/or breakage," "loss of neurological function, appearance of radiculopathy, and/or development of pain," "infection," "paralysis," and "death." The package insert noted that additional surgery might be necessary "to correct some of these anticipated adverse reactions." The package insert further provided:

A successful result is not always achieved in every surgical case. This fact is especially true in spinal surgery where many extenuating circumstances may compromise the results. The TSRH Spinal System is only a temporary implant and should only be used to augment spinal fusion .... No spinal implant can withstand body loads without the support of bone. In this event, bending, loosening, dissembly and/or breakage of the device(s) will eventually occur.

TSRH Package Insert in Use in 1993.

### Discussion

### (1)

■ Under the New York law of products liability, which the parties agree is

2. Dr. Abitbol's report states that while Sita had "lots of concerns related to a broken screw," "[broken screws] in themselves do not cause pain." Dr. Abitbol thought that Sita "may have other causes for his back pain" which would be "very difficult to discern at this point." Abitbol Medical Rec., dated 11/3/95. Plaintiff claims that these comments by Dr. Abitbol should be discounted because Dr. Abitbol was a Danek "product champion" who received $16,250 in consulting fees from Danek in 1995, the year in which Dr. Abitbol examined plaintiff for the Worker's Compensation Board. Plaintiff contends that Dr. Abitbol also receive an additional $12,360 in travel reimburse-ment expenses and $3,600 in unspecified payments from Danek.

controlling, a plaintiff may assert that a product is defective because of: (i) a mistake in manufacturing; (ii) improper design; or (iii) failure to provide adequate warnings regarding the use of the product. *See Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 106–07, 463 N.Y.S.2d 398, 401, 450 N.E.2d 204 (1983). Here, plaintiff does not allege a defect in the manufacturing of the cracked TSRH spinal screw, but claims, instead, that the design of the TSRH System was defective and that the warnings provided were inadequate.

 In order to survive a motion for summary judgment on a cause of action for strict products liability, a plaintiff must offer sufficient evidence upon which a reasonable jury could base the conclusion that: (i) a product was "defective" in that it was not reasonably safe for use in the manner intended; (ii) a product's defect was a "substantial factor" in causing the plaintiff's injury or damages; (iii) at the time of the occurrence of the injury, the product was being used "for the purpose and in the manner normally intended;" (iv) the defect could not have been discovered by the plaintiff and its danger perceived by the exercise of reasonable care; and (v) the plaintiff's injury or damage could not have been averted by the exercise of reasonable care. *Id.* at 106, 463 N.Y.S.2d at 401, 450 N.E.2d 204; *Fane v. Zimmer*, 927 F.2d 124, 128 (2d Cir.1991) (citation omitted). It is also well-settled that in New York, "whether the action is pleaded in strict products liability, breach of warranty or negligence," the plaintiff in a products liability case bears the burden of establishing "that a defect in the product was a substantial factor in causing the injury." *Tardella v. RJR Nabisco, Inc.*, 178 A.D.2d 737, 576 N.Y.S.2d 965, 966 (3rd Dept.1991) (citing *Rosado v. Proctor & Schwartz*, 66 N.Y.2d 21, 25, 494 N.Y.S.2d 851, 854, 484 N.E.2d 1354 (1985); *Heller v. U.S. Suzuki Motor Corp.*, 64 N.Y.2d 407, 412, 488 N.Y.S.2d 132, 135, 477 N.E.2d 434 (1985)). *See also Gilks v. Olay Co., Inc.*, 30

F.Supp.2d 438, 443 (S.D.N.Y.1998) (interpreting New York law).

## Causation

As a threshold matter, defendant's argument that plaintiff has failed to offer sufficient proof of causation to survive a motion for summary judgment will be addressed, as causation is an element not only in defendant's strict products liability claims, but in plaintiff's negligence, breach of warranty, fraud, misrepresentation and per se negligence claims as well.

 In order to survive a motion for summary judgment, plaintiff must carry the burden of proof that defendant's broken screw proximately caused plaintiff's injuries. *See Lindsay v. Ortho Pharmaceutical Corp.*, 637 F.2d 87, 90–91 (2d Cir. 1980) (interpreting New York law). Here, a close question is presented on the issue of causation. While much of plaintiff's evidence of causation is barely viable, plaintiff has submitted sufficient evidence upon which a reasonable jury could conclude that defendant Danek's spine screw was a substantial cause of plaintiff's injury. *Cf. Krasnopolsky v. Warner–Lambert Co.*, 799 F.Supp. 1342, 1345 (E.D.N.Y.1992) (court in products liability action stated that "mere conclusory allegations, speculation or conjecture will not avail a party resisting summary judgment") (citing *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990)).

In support of plaintiff's opposition to defendant's motion for summary judgment, plaintiff submits an expert report produced by Dr. Seymour Einhorn. In his report, Dr. Einhorn states that

the broken pedicle screw is a contributing factor in the patient's pain and neurological impairment, as well as causing the fracture [3] of the corresponding pedicle resulting in additional associated complication and impairment.

**3.** None of plaintiff's treating physicians diagnosed a fracture of the pedicle.

Einhorn Report, dated 9/29/97. In his 1997 report, Dr. Einhorn also notes that he previously concluded that plaintiff suffers from pseudarthrosis (non-union or failure of the bone to fuse; not "fracture") of the lumbar spine. See background (2), supra. However, Dr. Einhorn's 1997 report, written more than two years after his examination of plaintiff, fails to explain how Dr. Einhorn arrived at the conclusion that plaintiff's pain and alleged pseudarthrosis were caused by the fractured pedicle screw, and not, as suggested by Dr. Weber, by the failure of plaintiff's own bone to fuse properly following the second, anterior, spinal surgery. See Rec. of Pl. Visit to Weber, dated 11/10/94. Dr. Einhorn apparently concluded that because plaintiff allegedly suffered pain after the fifth spine screw broke, the broken screw caused the pain.[4]

Plaintiff has also failed to explain a number of discrepancies within and between Dr. Einhorn's May 1995 and 1997 reports. First, the May 1995 report is internally inconsistent. When asked to examine plaintiff for the purpose of assessing plaintiff's entitlement to Worker's Compensation benefits, Dr. Einhorn diagnosed plaintiff with pseudarthrosis (non-union or failure of the bone to fuse). See Einhorn Letter, dated 5/16/95. However, Dr. Einhorn had earlier in the same report observed that he could not tell whether the bone from any of plaintiff's spinal surgeries had fused. See id. Thus, Dr. Einhorn's finding that plaintiff suffered from pseudarthrosis is implausible.

There are also several discrepancies between the May 1995 and September 1997 reports. In his September 1997 report, Dr. Einhorn noted that "[his] examination of [plaintiff] on May 16, 1995 revealed ... [that] one of the lower pedicle screws was broken." Einhorn Report, dated 9/29/97.

Dr. Einhorn did not make this finding in his May 1995 report, perhaps because the fact of the broken pedicle screw would not have been important to a Worker's Compensation determination. Nor did Dr. Einhorn then conclude that any of defendant's TSRH screws had caused or contributed to plaintiff's pain, as he did in his 1997 report. Again, this discrepancy might be explained away because in a Worker's Compensation proceeding, medical causation of the type at issue here may not be material. However, Dr. Einhorn did not, in May 1995, indicate, as he did in his September 1997 report, that plaintiff had a fractured pedicle, a fact that might well have been important to a Worker's Compensation determination. These unexplained inconsistencies—the finding of pseudarthrosis without evidence of non-union and the failure to diagnose a fractured pedicle in May 1995—cast a shadow of doubt upon the credibility of Dr. Einhorn's report.

Notwithstanding plaintiff's flawed expert report, there appears to be sufficient evidence of causation in the record to survive a motion for summary judgment. Following plaintiff's second, anterior, spine surgery on November 8, 1993, plaintiff experienced a complete relief of symptomatology. Plaintiff made no complaints of pain in his back at his follow-up evaluations in January and February of 1994, and x-rays taken at the January 13 evaluation did not disclose a fracture in any of the TSRH screws implanted during plaintiff's posterior surgery. See Recs. of Pl. Visits to Dr. Weber, dated 1/13/94, 1/20/94, 2/10/94. At plaintiff's following visit to Dr. Weber on March 10, 1994, however, plaintiff complained of some mild back discomfort. See id., dated 3/10/94. X-rays taken on that day disclosed, for the first time, that one of the TSRH screws implanted in the pedi-

---

4. Dr. Einhorn submitted an additional one-page report after the close of discovery on February 17, 1998. See Pl. Mem. of Law, at Exh. 16. The observations and conclusions contained within it are mostly cumulative of those contained within Dr. Einhorn's earlier reports. The only new opinion that Dr. Einhorn expresses in this report is that plaintiff's condition is not improving and no improvement is expected. These opinions do not help plaintiff to discharge his burden of proving causation.

cles of plaintiff's spine had fractured. *Id.* Based on these facts, a fair inference can be made that a substantial cause of plaintiff's pain was the fractured TSRH screw.

Defendant, nevertheless, contends that plaintiff has not submitted any evidence that raises a genuine factual issue that the screws, much less a defect in one of the screws, placed in the pedicles of Sita's spine caused him the injuries of which he now complains. First, defendant notes that Sita's treating physicians did not attribute Sita's pain to any of defendant's spine screws;[5] plaintiff's medical records reflect that the screws remained in good position despite the fracture of the fifth screw; and plaintiff's medical records also suggest that Sita's spine fused at the site of the bone graft aided by the TSRH instrumentation. Of these assertions, only the third is truly in dispute. But even if Dr. Einhorn's testimony is discounted on the issue of pseudarthrosis, these assertions, alone, are insufficient to establish, as a matter of law, that defendant's spine screws were not a substantial cause of plaintiff's injuries. The opinions of plaintiff's treating physicians, while relevant, are not conclusive, and the cracked screw, while not necessarily contributing to pseu-

darthrosis, might plausibly have caused nerve or other damage.

■ Defendant also contends that in cases where there are complex issues of medical causation, plaintiffs must ordinarily introduce medical testimony establishing causation to prove that their injuries were caused by a defect in a defendant's product. *See, e.g., Fane v. Zimmer*, 927 F.2d 124, 131 (2d Cir.1991) (interpreting New York law). Here, defendant points out, the only expert report bearing on the issue of causation is Dr. Einhorn's one-paragraph report, which, as discussed above, is of dubious reliability. Moreover, defendant contends that the Einhorn report is not even admissible. Defendant argues that the report does not comport with the strictures of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), for failure to rule out other potential causes of plaintiff's pain.[6] In *Daubert*, the seminal case on the admissibility of expert testimony, the Supreme Court held that Fed.R. of Evid. 702 requires that expert testimony be both reliable and relevant to be admissible. *Id.* at 589, 113 S.Ct. 2786. It is not clear, however, that *Daubert* would require the type of exacting differential diagnosis that defendant contends Dr. Einhorn was required to engage in here.[7]

---

5. Plaintiff's counsel contends that Dr. Einhorn is a treating physician. This contention is not supported by the record.

6. Defendant's counsel also argue that the Einhorn report is inadmissible because Dr. Einhorn did not state that his opinion was accurate to "a reasonable degree of medical certainty." Def.Mem. of Law in Supp. of Summary Judgment, p. 20 & n. 24. Aside from the formalistic nature of this argument, we are not here dealing with trial testimony. Furthermore, given counsel's argument that Dr. Einhorn's testimony was insufficient to establish causation due to its alleged conclusory nature, the argument that plaintiff's expert's testimony should be barred for failure to make what amounts to a conclusory statement comes with ill grace. Defendant's counsel further contends that Dr. Einhorn was required under New York law to state that the broken TSRH screw was a "substantial factor" in bringing about plaintiff's inju-

ries. Dr. Einhorn, in his report, stated that the broken screw was a "contributing factor." Again, counsel's adherence to form over substance clouds the issue. The dictionary definition of "contribute" is "[t]o act as a determining factor." Websters II: New Riverside University Dictionary, p. 306. Certainly, a "determining factor" is one that is "substantial."

7. In *Kumho Tire Co., Ltd. v. Carmichael*, No. 97–1709, 1999 WL 152275 at *3 (March 23, 1999), the Supreme Court recently held that in addition to scientific testimony, *Daubert's* general holding also applies to expert testimony based on technical and other specialized knowledge. In that case, the Supreme Court emphasized the discretionary nature of the district court's "gatekeeping" obligation, and the "broad latitude" granted to district court judges in determining an expert witness' reliability. *See id.* The Supreme Court explained that the *Daubert* test of reliability is

Under *Daubert,* a district court must evaluate proffered expert testimony to determine if it is: "(1) [based upon] scientific knowledge, that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. To that end, the trial judge must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. The Supreme Court explained that "the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at 590, 113 S.Ct. 2786. As one would expect, "the adjective 'scientific' implies a grounding in science's methods and procedures," while " 'knowledge' connotes more than subjective belief or unsupported speculation." *Id.* The latter term "applies to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds." *Id.* (quotation omitted). The information that the screw broke would certainly be the type of information that physicians would use or believe to be relevant for diagnostic and treating purposes.

Moreover, defendant's insistence on imposing the rigors of *Daubert* on Dr. Einhorn's report likely stems from the mistaken assumption that this case involves a complex question of medical causation such as the effect of environmental factors in, for example, a toxic tort case. In fact, the question presented by this case is not nearly so complex. While the explanation of medical causation offered by defendant seems to be more plausible than Dr. Einhorn's, it is not so compelling that, as a matter of law, a jury must reject plaintiff's

claim. It is not outside the scope of reason and common sense to conclude that when a medical device fractures inside of a patient roughly contemporaneously with the time that the patient starts to complain of pain in the relevant area, that fracture might well be a substantial factor in causing that pain. Although plaintiff's evidence on causation is thin indeed, and appears not to be sufficient to cross the line for plaintiff to avoid being non-suited, Dr. Einhorn's credibility and the reliability of the conclusions he reaches in his report, while highly suspect, remain questions for a jury. Accordingly, defendant's motion for summary judgment on the ground of lack of causation is denied.[8]

## Defective Design

 In a design defect case, "the focus is on whether the product, as designed, was not reasonably safe or presented an unreasonable risk of harm to the user." *Fane,* 927 F.2d at 128 (citing *Voss,* 59 N.Y.2d at 107, 463 N.Y.S.2d 398, 450 N.E.2d 204). More precisely, the standard is whether, "if the design defect were known at the time of manufacture, a reasonable person would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *Id.* (quotation omitted). The burden of presenting evidence that "the product, as designed, presented a substantial likelihood of harm and feasibly could have been designed more safely" is on the plaintiff. *Id.*

 Here, plaintiff has failed to carry his burden of establishing that the TSRH screws at issue were defectively designed. First, plaintiff has not shown that the TSRH screws implanted in his pedicles were "defective." Indeed, the evidence establishes that the TSRH System was rea-

"flexible" and stressed that *"Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Id.*

**8.** In light of the denial of defendant's motion for summary judgment on the basis of lack of

proof of causation, plaintiff's argument that the burden of proof on the issue of causation should be shifted to defendant because defendant intentionally failed to conduct tests and studies which would have provided plaintiff with evidence of causation need not be addressed.

sonably safe for use in exactly the manner in which that system was used. Defendants submitted an impressive compendium of surgeon's testimony presenting the opinions of 270 orthopedic spine and neurological surgeons that the use of internal fixation devices, such as the TSRH System was, and still is, the accepted standard of care in that medical community. Plaintiff, however, alleges that the "overwhelming majority" of these surgeons have financial ties to the spine fixation device industry in the form of research grants and other perquisites, and thus, have an incentive to be less than truthful in their endorsements. In support of this claim, plaintiff's counsel submits a lengthy list of surgeons alleged to have ties to that industry. Plaintiff's claim, however, is belied by a simple comparison of the names on both lists. Taking the facts alleged in plaintiff's list to be true, at best, only 52 out of the 270 surgeons listed in defendant's compendium, or less than 20%, have financial or other ties to defendant's industry. That leaves unimpeached and unrefuted the testimony of 218 independent orthopedic spine surgeons that the use of spinal screw systems in the pedicles of the spine to support bone graft surgery represented the standard of care in the relevant medical community at the time in question.[9]

Despite the unrefuted acceptance of spine screw systems in the relevant medical community as the standard of care, plaintiff maintains that these systems are unsafe and defective. In support of this assertion plaintiff submits a report from a "generic expert," Dr. Alexander.[10] In the report, Dr. Alexander discusses what he perceives to be a lack of objective and reliable medical evidence establishing the safety and utility of pedicle screw fixation techniques. Dr. Alexander also contends that the benefits of pedicle screw systems, including an increased likelihood of obtaining a solid fusion, are still theoretical, and points to studies citing risks of screw misplacement, mechanical failure, osteoporosis, inflammation, and infection, and higher risks of reoperation and surgical complication than are present in noninstrumented spinal surgeries. But Dr. Alexander's contention that the benefits of pedicle screw instrumentation are "theoretical" does not pertain to the specific facts of this case or the TSRH device implanted in plaintiff's spine, and, more importantly, nowhere in Dr. Alexander's non-specific report does he state what is wrong with the TSRH screws at issue here, an absolute prerequisite under New York law. See McCarthy v. Olin Corp., 119 F.3d 148, 155 (2d Cir. 1997) (interpreting New York law; "there must be something wrong with the product, and if nothing is wrong there will be no liability"). In addition, Dr. Alexander, while not offering an opinion on the TSRH System in his report, admits that the TSRH System "imparts the best stability of any of the devices to the spine that I've experienced." Alexander Dep., at pp. 880–81. For these reasons, Dr. Alexander's opinion must be rejected.

Dr. Gary M. Franklin, M.D., M.P.H., the only other generic expert in this case to offer an opinion bearing on the issue of

9. Plaintiff also contends that its claims should be evaluated under the design defect standard articulated by the Restatement (Third) of Torts. The Restatement provides that

[a] prescription drug or medical device is not reasonably safe due to defective design if the foreseeable risks of harm posed by the drug or medical device are sufficiently great in relation to its foreseeable therapeutic benefits that reasonable health-care providers, knowing of such foreseeable risks and therapeutic benefits, would not prescribe the drug or medical device for any class of patients.

Restatement (Third) of Torts, Products Liability, § 6(c) (1998). Under the Restatement's definition of design defect, plaintiff's claims fail. It seems apparent that in adopting the use of spinal screw systems as the industry standard of care, "reasonable health-care providers" have determined that the "foreseeable risks of harm" posed by the use of spinal screw systems do not outweigh their "foreseeable therapeutic benefits."

10. Dr. Alexander was designated by plaintiffs as a "generic expert" in MDL 1014.

product defect, offers only the general opinion that "the indications, efficacy, and outcome of lumbar fusion procedures have not been adequately studied, and the actual outcomes of such procedures are worse than those results which are reported." Decl. of Gary M. Franklin, M.D., M.P.H., ¶ 9, at Pl.Exh. 32. Dr. Franklin concludes that "the indications and desirability of using instrumentation (including pedicle screw devices) should be critically revisited." *Id.* Dr. Franklin does not, however, express the opinion that pedicle screw systems are unsafe as designed or state that reasonable persons would not conclude that the utility of using such systems outweighs the risks involved in their use. Nor does Dr. Franklin address his comments to the specific instrumentation at issue here, Danek's TSRH spine screws.[11]

Plaintiff's only other possible witness on the issue of product defect, Dr. Einhorn, never even opines that the TSRH instrumentation implanted in plaintiff's spine "was not reasonably safe or presented an unreasonable risk of harm to the user." *Fane v. Zimmer,* 927 F.2d 124, 128 (2d Cir.1991) (citations omitted). Nor does Dr. Einhorn suggest that a reasonable person, aware of the alleged design defect at the time of manufacture, "would conclude that the utility of the product did not outweigh the risk inherent in marketing a product designed in that manner." *Id.* Dr. Einhorn simply states in his letters that a screw broke; but the fact that a medical device broke is not proof of a defect.

█ Seeking to portray the TSRH Spinal System as unsafe, plaintiff makes much of the fact that the TSRH System was not then, in May 1993 at the time of his instrumented surgery, and still has not been approved by the FDA for use in spinal surgeries of the type performed on him. The fact that a medical device has not been approved by the FDA for a particular use does not, however, mean that the device is unsafe, much less that the device is defective. *See* discussion (4), *infra.*

For the reason that plaintiff has failed to come forth with proof of a defect in the design of the components implanted in his spine, Danek is entitled to summary judgment on the design defect claim, whether pleaded in strict products liability, negligence, or breach of warranty. *See Tardella v. RJR Nabisco, Inc.,* 178 A.D.2d 737, 576 N.Y.S.2d 965, 966 (3rd Dept.1991) (the plaintiff in a products liability action, whether pleaded in strict products liability, negligence or breach of warranty bears the burden of proving that the product was defective) (citing *Rosado v. Proctor & Schwartz,* 66 N.Y.2d 21, 25, 494 N.Y.S.2d 851, 854, 484 N.E.2d 1354 (1985); *Heller v. U.S. Suzuki Motor Corp.,* 64 N.Y.2d 407, 412, 488 N.Y.S.2d 132, 135, 477 N.E.2d 434 (1985)). *See also Gilks v. Olay Co., Inc.,* 30 F.Supp.2d 438, 443 (S.D.N.Y.1998) (interpreting New York law); discussion (1), *supra;* discussion (1), *infra.*

█ Not only has plaintiff failed to establish that the TSRH System was defective as designed, plaintiff has also not produced any evidence of another essential element of a negligence or strict products liability design defect claim under New York law, to wit, that the TSRH System "feasibly could have been designed more safely." *Fane v. Zimmer,* 927 F.2d 124, 128 (2d Cir.1991) (interpreting New York law); *Denny v. Ford Motor Co.,* 87 N.Y.2d 248, 257–58, 639 N.Y.S.2d 250, 255, 662 N.E.2d 730 (1995) (discussing "risk/utility" balancing approach common to both negligence and strict products liability design defect causes of action). Plaintiff, inexplicably turning to Ohio law, contends that he is "not required to provide such evidence." Pl.Mem. of Law in Opp. to Def.Mot. for Summary Judgment, p. 24 (Citing *Welsh Sand & Gravel v. O&K Trojan, Inc.,* 107 Ohio App.3d 218, 668 N.E.2d 529 (1995).) Put bluntly, plaintiff is wrong. First, plaintiff does not argue that there are any

---

11. The remaining MDL 1014 generic experts also do not support any claim of defect since, among other reasons, their reports do not discuss the TSRH System.

258

choice of law issues here and that this court should be applying Ohio, and not New York, law. Indeed, at oral argument on February 18, 1999, plaintiff's counsel conceded that Ohio law does not apply. *See* Tr., dated 2/18/99, pp. 6–7. Under New York law, it is well settled that a party seeking to recover damages on a theory of strict products liability is required to present evidence of a safer design alternative that feasibly could have been implemented. *See., e.g., Voss,* 59 N.Y.2d at 108, 463 N.Y.S.2d at 402, 450 N.E.2d 204; *Fane,* 927 F.2d at 128 (interpreting New York law). Plaintiff's reliance on what Ohio law presumably requires underscores plaintiff's inability to offer any evidence on the issue of safer alternative design.

At oral argument, counsel for plaintiff also argued, for the first time, that New York law did not require proof of a feasible safer design alternative, and that even if it did, that safer alternatives would be a system that used hooks instead of screws or no system at all. *See* Tr., dated 2/18/99, pp. 44–48. Plaintiff's counsel reiterated these arguments in plaintiff's second supplemental memorandum of law. *See* Pl. Supp.Mem. of Law II, pp. 1–5. Both of these arguments, however, lack merit.

In support of plaintiff's argument that New York law no longer requires proof of a feasible safer design alternative, plaintiff relies upon the New York Court of Appeals' decision in *Denny v. Ford Motor Co.,* 87 N.Y.2d 248, 259, 639 N.Y.S.2d 250, 256, 662 N.E.2d 730 (1995). Plaintiff erroneously points to the Court of Appeals' discussion of the standard of proof required in a UCC-based breach of implied warranty action, which does not require proof of a safer design alternative, to conclude that New York law does not require proof of safer design alternatives in a strict products liability case. *See* Pl.Supp. Mem. of Law II, pp. 1–2. In fact, the Court of Appeals expressly affirmed that New York strict products liability law requires proof of a feasible safer design al-

ternative. *See id.* at 257, 639 N.Y.S.2d at 255, 662 N.E.2d 730.

Nor, as plaintiff contends, has the Second Circuit recognized any such modification in New York's law of strict products liability. The case cited in plaintiff's second supplemental brief, *McCarthy v. Olin Corp.,* 119 F.3d 148, 173 (2d Cir.1997), is inapposite. There, the Second Circuit held merely that under a risk/utility analysis, "there is no reason to search for an alternative safer design where the product's sole utility is to kill and maim." *Id.* at 155 (discussing exploding hollow-point bullets). Here, there is no allegation that defendant's spinal screw system was designed to cause injury, much less maim or kill its intended recipients. Accordingly, plaintiff is not relieved of the burden imposed by New York law of offering proof of a feasible safer design alternative.

Faced with the burden of producing evidence of a safer design alternative, plaintiff contends that a system that uses hooks instead of screws or no system at all would both be safer than defendant's TSRH spine screws. Plaintiff, however, was unable to offer or cite any evidence to support these conclusory arguments, either at oral argument or in either of plaintiff's memoranda of law. Moreover, hook-based support systems which attach to the lamina of the spine cannot be used in patients who have undergone a prior spinal surgery because the lamina is routinely removed during such surgeries in order to give the spinal nerves more room to move around. *See* Tr., dated 2/18/99, pp. 46–47. Thus, for patients who have undergone a prior spinal surgery, the only viable surgical option available to the surgeon and the patient is fixation with screws. Under the Restatement view, "[a] prescription drug or device manufacturer defeats plaintiff's design defect claim by establishing one or more contexts in which its product would be prescribed by reasonable, informed health care providers." Restatement of Torts (Third), cmt.f, p. 149. This is such a context. Accordingly, summary judgment

against plaintiff on the design defect claim is also warranted for plaintiff's failure to introduce evidence of a feasible safer design alternative.

**Defective Warning**

■ Plaintiff next contends that the warning accompanying the TSRH System rendered the product defective. At issue here is the sufficiency of the warning given to plaintiff's surgeon, Dr. Weber, by defendant Danek. Under New York law, a defense is provided against liability for failure to warn when a drug or medical device is " 'properly prepared, and accompanied by proper directions and warning.' " *Martin v. Hacker,* 83 N.Y.2d 1, 8, 607 N.Y.S.2d 598, 601, 628 N.E.2d 1308 (1993) (quoting *Wolfgruber v. Upjohn Co.,* 72 A.D.2d 59, 61, 423 N.Y.S.2d 95, 97 (4th Dept.1979), *aff'd.,* 52 N.Y.2d 768, 436 N.Y.S.2d 614, 417 N.E.2d 1002 (1980) (quotation and citation omitted)). The manufacturer satisfies its duty by "warn[ing] of all potential dangers in its prescription drugs that it knew, or, in the exercise of reasonable care, should have known to exist." *Id.* (quotations and citations omitted).

■ Product warnings are intended for the physician, "whose duty it is to balance the risks against the benefits" of various treatments and to prescribe the treatments he or she thinks best. *Id.* at 9, 628 N.E.2d 1308, 607 N.Y.S.2d 598. As the New York Court of Appeals noted in *Martin,* "[t]he physician acts as an 'informed intermediary' [ ] between the manufacturer and the patient." *Martin,* 83 N.Y.2d at 9, 607 N.Y.S.2d at 601, 628 N.E.2d 1308 (citing *Wolfgruber,* 72 A.D.2d at 61, 423 N.Y.S.2d 95). Thus, "the manufacturer's duty to caution against a drug's side effects is fulfilled by giving adequate warning through the prescribing physician, not directly to the patient." *Id.*

■ As is the case with prescription drugs, the manufacturer of a medical device does not have a duty to directly warn a patient of risks associated with the device, but instead discharges its duty by providing the physician with sufficient information concerning the risks of the device. *See Fane v. Zimmer,* 927 F.2d at 129 (interpreting New York law). In *Fane,* the court applied the learned intermediary doctrine to the warning provided by the manufacturer of an orthopedic fixation system designed to assist in the healing of a hip bone. *See id.* at 125. The purpose of the hip fixation system, like the TSRH System, was to hold pieces of bone together to improve a patient's chances of properly healing. *See id.* The *Fane* court granted the defendant manufacturer summary judgment on the issue of failure to warn because the fixation system was available only upon supervision of a physician, and a package insert warned of the risk of suffering the very type of injury of which the plaintiff complained. *See id.* at 129.

■ Here, plaintiff's "failure to warn" claim, whether sounding in negligence or strict liability, is barred under the informed intermediary doctrine. *See Martin,* 83 N.Y.2d at 8 n. 1, 607 N.Y.S.2d at 601, 628 N.E.2d 1308 ("Where liability is predicated on a failure to warn, New York views negligence and strict liability claims as equivalent.") (citing *Wolfgruber,* 72 A.D.2d at 62, 423 N.Y.S.2d 95). Plaintiff does not dispute that the TSRH System is a medical device that can only be implanted by a physician. Moreover, the package insert provided specific information on the risks associated with the use of the TSRH System including pseudarthrosis, breakage, neurological impairment and pain—the very injuries of which plaintiff now complains.

However, due to the boiler-plate nature of the language used and the warning's failure to state that certain components of the TSRH System had not been approved for use in pedicle surgery, these warnings, taken alone, might not fully apprise a doctor of the risks associated with the use of TSRH components. Nonetheless, while the package insert did not expressly state

that the TSRH System's spine screws had not been approved for use in the pedicles, or that any such use was experimental, the insert did contain the following warning: "Except for the TSRH staples, all of the components of the TSRH Spinal System are intended for hook fixation/attachment to the spine and/or screw fixation/attachment to the sacrum or ilium only." Treharne Aff., at Exh.3. This warning, to an experienced doctor such as Dr. Weber, could only mean that the TSRH screws had not been approved for use in the pedicles. Thus, despite plaintiff's claims to the contrary, there can be no dispute that the package insert contained language that adequately warned against the precise usage and injuries in question. Accordingly, defendant's motion for summary judgment on the failure to warn claims is granted.

### (2)

Turning to plaintiff's fraud claim, the parties dispute whether this claim, dismissed by Judge Bechtel in *In re: Orthopedic Bone Screw Prod. Liab. Litig.*, MDL 1014, 1997 WL 305257 (E.D.Pa. March 1997), should be reinstated in light of the Third Circuit's decision in *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 159 F.3d 817 (3rd Cir.1998) (holding that it was error for MDL court to determine that all MDL 1014 plaintiffs had failed to allege a causal nexus legally sufficient to establish fraud). This dispute need not be addressed as the fraud claim fails for lack of proof of reliance. Thus, reinstating or allowing amendment to reinstate the fraud claim would be futile.

■■■■ To succeed on a claim of fraud or negligent misrepresentation, a plaintiff must establish reliance upon a false statement or material misrepresentation or omission. *King v. Crossland Savings Bank*, 111 F.3d 251, 257–58 (2d Cir.1997) (interpreting New York law); *Fane*, 927 F.2d at 130 (same); *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 274 (2d Cir.1992) (same). Here, there is no proof of a specific false statement, much less an intentionally false statement, made

by Danek's representatives upon which either plaintiff or Dr. Weber relied in electing to perform surgery using defendant's TSRH instrumentation. Accordingly, defendant's motion for summary judgment on plaintiff's claims for fraud and misrepresentation is granted.

### (3)

■■■ Because plaintiff's fraud claim fails, so too does his conspiracy claim. No independent action of civil conspiracy is cognizable at law. *See Alexander & Alexander v. Fritzen*, 68 N.Y.2d 968, 969, 510 N.Y.S.2d 546, 546, 503 N.E.2d 102 (1986) ("[a]llegations of conspiracy are permitted only to connect the actions of separate defendants with an otherwise actionable tort."); *Smukler v. 12 Lofts Realty, Inc.*, 156 A.D.2d 161, 163, 548 N.Y.S.2d 437, 439 (1st Dept.1989) (before a plaintiff can make out a conspiracy claim, he or she first must plead specific wrongful acts which constitute an independent tort). In addition, the tort underlying a conspiracy claim must be an intentional one. *See Brooklyn Law School v. Aetna Casualty & Surety Co.*, 849 F.2d 788, 789 (2d Cir.1988). Here, the only intentional tort alleged in the complaint upon which plaintiff's conspiracy claim could be based is fraud, which claim fails for the reason set forth immediately above. Accordingly, plaintiff's conspiracy claim is dismissed.

### (4)

Plaintiff also seeks recovery for alleged violations of the Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. § 301, *et seq.*, and the Medical Device Amendments to that Act ("MDA's"), 21 U.S.C. § 360, *et seq.* The medical device at issue in this litigation is subject to regulation by the FDA pursuant to the FDCA and MDA's. While there is no express or implied private cause of action provided for plaintiffs under these statutes, *see* 21 U.S.C. § 337(a); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 487, 116 S.Ct. 2240, 2251, 135 L.Ed.2d 700 (1996), plaintiff contends that

he is entitled to recovery under a theory of per se negligence.

The FDCA and MDA's are safety statutes. *See Lohr*, 518 U.S. at 487, 116 S.Ct. at 2251. Under these laws, the FDA is required to promulgate regulations classifying medical devices into one of three categories. *See* 21 U.S.C. § 360c. Class I devices are those which generally pose little or no threat to public health and safety, such as tongue depressors, bedpans, crutches and elastic bandages. *See* 21 U.S.C. § 360c(a)(1)(A); 21 C.F.R. §§ 880.5075, 880.6230, 880.6730, 890.3150 (1993). Class II devices are more complex than Class I devices and pose a greater risk to health and safety, such as oxygen masks and syringes. *See* 21 U.S.C. § 360c(a)(1)(B); 21 C.F.R. §§ 868.5580, 880.5570 (1993). Class III devices are those which "present a potential unreasonable risk of illness or injury." 21 U.S.C. § 360(a)(1)(C)(ii)(II).

Each class of medical device is subject to a different degree of regulation. Class III devices may not be introduced into commerce unless they receive "premarket" or other approval from the FDA. *See* 21 U.S.C. §§ 360c(a)(1)(C), 360e. Before the FDA may grant premarket approval for a device, it must determine that there is a "reasonable assurance" that the device is "safe" and "effective" "under the conditions of use prescribed, recommended or suggested in the proposed labeling thereof." 21 U.S.C. § 360e(d)(2). It takes an average of 1200 hours for the FDA to complete the review of a medical device submitted for pre-market approval. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 477, 116 S.Ct. 2240, 2247, 135 L.Ed.2d 700 (1996). A manufacturer may circumvent the lengthy pre-market approval process by establishing that the medical device sought to be marketed is "substantially equivalent" to a device that existed on the market prior to the enactment of the FDCA in 1976. *See* 21 U.S.C. § 360e(b)(1)(B). This process, known as a 510(k) clearance (after the number of the section in the original

Act that contained this provision), takes about twenty hours to complete. *See Lohr*, 518 U.S. at 478, 479, 116 S.Ct. at 2247.

A device may receive pre-market approval or 510(k) clearance for certain uses and not others. *Cf. Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 692 (2d Cir.1994) (drugs may be approved by FDA for certain uses but not others). The marketing and promotion of a Class III device for an unapproved use violates § 331 of the FDCA. *See id.;* 21 U.S.C. § 331. Section 331 of the FDCA provides that certain acts, and the causing of such acts, are prohibited, including:

(a) The introduction or delivery for introduction into interstate commerce of any ... device ... that is adulterated or misbranded. (b) The adulteration or misbranding of any ... device ... in interstate commerce. (c) The receipt in interstate commerce of any ... device ... that is adulterated or misbranded, and the delivery or proffered delivery thereof for pay or otherwise.

21 U.S.C. § 331. Under the FDCA, "[a] ... device is deemed adulterated ... if it is a Class III device" which, *with respect to an intended use,* has not received pre-market approval or § 510(k) clearance. *See* 21 U.S.C. § 351(f) (emphasis added). The FDCA further provides that "[a] device shall be deemed misbranded" unless the device provides "adequate directions" for its intended use, including relevant hazards, effects and side effects, indications and contraindications, and warnings to medical practitioners cautioning them on how to make use of the device safely and in the manner in which it is intended to be used. *See* 21 U.S.C. § 352(f); 21 C.F.R. §§ 801.4, 801.109 (1993).

Plaintiff contends that Danek violated the FDCA and MDA's provisions on adulteration and misbranding by: (i) knowingly marketing its TSRH System for unauthorized use in the pedicles of the spine; (ii) failing to advise plaintiff of the risks posed by using defendant's spine screws in

pedicle surgery; (iii) failing to warn plaintiff that use of TSRH screws in pedicle surgery was considered by the FDA to be "experimental"; (iv) failing to obtain proper consent forms from plaintiff; (v) failing to comply with FDA protocol on conducting independent study of the TSRH System. Plaintiff alleges that these violations constituted per se negligence under New York law.[12] Defendant counters that the maintenance of such a suit would violate the Congressional intent underlying the FDCA by circumventing the Act's prohibition against private rights of action, and that even if plaintiff's claim were addressed on the merits, defendant's motion for summary judgment should be granted for lack of proof of causation.

■ As to defendant's first argument, the Court of Appeals for the Second Circuit has expressly recognized that a private cause of action for per se negligence arises under New York State law upon violation of the FDCA. *See Ezagui v. Dow Chemical Corp.*, 598 F.2d 727, 733 (2d Cir.1979). *See also Stanton by Brooks v. Astra Pharmaceutical Products, Inc.*, 718 F.2d 553, 563–64 & n. 22 (3d Cir.1983) (applying per se negligence standard to violation of the FDCA); *Orthopedic Equipment Co. v. Eutsler*, 276 F.2d 455, 460–61 (4th Cir.1960) (same). Accordingly, plaintiff's per se negligence claims must be addressed on the merits.

■ In New York, violation of a statute constitutes per se negligence where "it can be shown that plaintiff belongs to the class of legislatively intended beneficiaries and that a right of action would be clearly in furtherance of the legislative

purpose." *CPC Int'l Inc. v. McKesson Corp.*, 70 N.Y.2d 268, 276, 519 N.Y.S.2d 804, 807, 514 N.E.2d 116 (1987) (citation omitted). To survive a motion for summary judgment on a claim of per se negligence, a plaintiff must also offer proof of causation sufficient to convince a reasonable jury. *See Martin v. Herzog*, 228 N.Y. 164, 170, 126 N.E. 814 (1920) (Cardozo, J.) (requiring proof of causation where violation of statute is alleged; "Proof of negligence in the air, so to speak, will not do.") (citation and quotations omitted); *Aranzullo v. Seidell*, 96 A.D.2d 1048, 1049, 466 N.Y.S.2d 690, 692 (2d Dept.1983) (plaintiff must "establish a causal connection between an unexcused violation of the applicable [statute] and the [plaintiff's injury]").

■ Here, there is no question that plaintiff belongs to the class of persons meant to be protected by the statute. There is, however, a question as to whether defendant Danek has violated any provision of the FDCA. Danek concedes that at the time of Sita's surgery, the TSRH screws had not been cleared by the FDA for labeling and marketing for use in the pedicles of the spine, but Danek denies that it promoted the TSRH System for use in pedicle surgery.

The screws used in plaintiff's surgery were, in fact, labeled for use in the sacrum and were sold pursuant to a 1986 FDA clearance. The use of the TSRH spinal screws in the pedicles of plaintiff's spine constituted what is called an "off-label" use—that is, an unauthorized use of a product that has been cleared by the FDA for other uses. Off-label use of a medical product is not illegal.[13] *See Ortho Phar-*

---

12. Plaintiff alleges a total of twenty-nine violations of the FDCA and MDA's, many of which are included within or related to the five claims enumerated above.

13. While it is fully within the FDA's authority to regulate which devices receive premarket approval and which devices do not, the FDA cannot regulate how doctors *use* approved drugs and medical devices. *See* 21 U.S.C. § 396 ("Nothing in this Act shall be construed to limit or interfere with the authority of a

health care practitioner to prescribe or administer any legally marketed device to a patient for any condition or disease within a legitimate health care practitioner-patient relationship."). As the Eight Circuit has explained:

> FDA approved indications were not intended to limit or interfere with the practice of medicine nor to preclude physicians from using their best judgment in the interest of the patient. Instead, the FDA ... approval

maceutical Corp. v. Cosprophar, Inc., 32 F.3d 690, 692 (2d Cir.1994) ("The FDA permits doctors to prescribe drugs [and internal fixation devices] for 'off-label' uses."). In fact, "[d]octors commonly exercise professional medical judgment and prescribe drugs for uses not within the indications articulated by the FDA." *Weaver v. Reagen*, 886 F.2d 194, 198–99 (8th Cir.1989). As the Third Circuit noted in *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 159 F.3d 817, 828 (3rd Cir.1998), "a device cleared under § 510(k) cannot lawfully be marketed for a use other than the use specified in the clearance. Thus, if such a device is marketed for another purpose, the manufacturer may be civilly and criminally sanctioned and the marketing enjoined." *Id.* (citing 21 U.S.C. §§ 331, 332).

### The "Illegal Promotion" Claim

In *Rhone–Poulenc Rorer Pharmaceuticals, Inc. v. Marion Merrell Dow, Inc.*, 93 F.3d 511 (8th Cir.1996), the Eighth Circuit explained that "[d]octors may prescribe an FDA-approved drug [or device] for non-approved uses, but the manufacturer may not promote non-approved uses [of the drug or device]." *Id.* at 514 n. 3. *See also Ortho Pharmaceutical Corp. v. Cosprophar, Inc.*, 32 F.3d 690, 692 (2d Cir.1994) (manufacturer is barred by law from marketing a medical drug or device for a purpose not authorized by the FDA). Plaintiff argues, with some support in the record, that despite Danek's denial that it promoted the TSRH System's use in pedicle surgery, Danek and the other manufacturers of spine screw systems funded seminars and endowed universities and private practitioners with grant money to promote

the use of spine screws in the pedicles of the spine, and to teach other orthopedic surgeons how to perform such surgery. In this way, plaintiff argues that these manufacturers accomplished their goal of promoting the use of spinal screw systems for an illegal, off-label use without having their names associated with such promotion. Plaintiff also contends that Danek funded a doctor's manual that contains a chapter which instructs orthopedic surgeons on the use of TSRH sacrum screws in the pedicles of the spine.

Importantly, although plaintiff compiled an extensive compendium of spine surgeons alleged to have been influenced by the use of industry money, plaintiff produced no evidence that Dr. Weber had financial ties to Danek or any other spine screw manufacturer. It is very clear that Dr. Weber had no financial interest in Danek and no corresponding financial incentive to use Danek's spine screws. Therefore, the only way that plaintiff can make his causation argument is to assert that Dr. Weber was influenced by his colleagues who had been "bought" and that somehow Dr. Weber and his other "unbought" colleagues have been subtly brainwashed by Danek's discrete promotional campaign. To prevail, plaintiff must establish that Dr. Weber was influenced by illegal marketing efforts which, in effect, made the use of TSRH and other spine screws in the pedicles of the spine so prevalent that the off-label use of such screws became the standard of care in Dr. Weber's medical community. Though tenuous, plaintiff's evidence is sufficient to satisfy plaintiff's burden of proof on a mo-

---

process is intended to ensure that drugs meet certain statutory standards for safety and effectiveness, manufacturing and controls, and labeling, 21 C.F.R. § 314.105(c) (1993), and to ensure that manufacturers market their drugs only for those indications for which the drug sponsor has demonstrated "substantial evidence" of effectiveness. *Id.* at §.314.126.

*Weaver v. Reagen*, 886 F.2d 194, 198–99 (8th Cir.1989) (quotation omitted). *See also Unit-*

*ed States v. An Article of Device Diapulse, etc.*, 768 F.2d 826, 832 (7th Cir.1985). A doctor using an FDA-approved drug or medical device for an off-label use bears the risk of being sued for malpractice if the plaintiff is harmed by an unwarranted use of the drug or device. Liability attaches to the manufacturer on a theory of per se negligence only if the manufacturer violated the FDCA or MDA's, and that violation caused plaintiff's injury.

tion for summary judgment on this question.

**Informed Intermediary**

There is, however, a critical break in plaintiff's chain of causation, between the assumed effects of Danek's alleged illegal marketing and promotion of the TSRH spine system, and Dr. Weber's decision to use the TSRH screws in the pedicles of plaintiff's spine. Dr. Weber was an experienced orthopedic surgeon. Even accepting the contention that Dr. Weber was initially led to use TSRH screws in the pedicles of a patient's spine by Danek's subtle promotional campaign, over time, the tenuous connection between conduct in which defendant is alleged to have engaged and Dr. Weber's decision to use TSRH screws in pedicle surgeries was broken. While Dr. Weber is now deceased, he was, at the time of his death in 1994, 52 years old, and had been a practicing orthopedic surgeon for seventeen years. *See* Aff. in Support of Summary Judgment, at Exh.C. Dr. Weber was President of the Long Island Orthopedic Society since 1986, and also taught at the State University at Stony Brook, New York Hospital–Cornell Medical Center and Long Island Jewish Medical Center. *See id.* He had published in a number of medical journals and was a diplomat of the American Board of Orthopedic Surgery. *See id.* Given Dr. Weber's academic qualifications and teaching positions, a jury could not credibly accept, as a jury must for plaintiff's counsel's theory to hold up, that Dr. Weber was unaware of developments in his field, and that he not only learned what he knew of using spine screws in the pedicles of the spine substantially because of Danek's alleged marketing efforts, but that he continued to use screws for pedicular applications because of Danek's subtle promotion.

TSRH spine screws were used for pedicle surgery at least as early as the mid–1980's and the surgery here occurred in 1993. A jury could not reasonably conclude that Dr. Weber was parroting the results of Danek's brainwashing campaign of his orthopedic colleagues, rather than relying upon his own personal experience, when, at least six years after the initiation of the alleged unlawful promotion efforts, he wrote in his notes that these spinal screw systems represented the "best instrumentation that we have had in years" and were "state of the art." *See* Recs. of Pl. Visit to Dr. Weber, dated 9/8/94, 11/10/94.

As plaintiff bears the burden of proof that defendant's marketing influenced Dr. Weber's decision to use the TSRH screws in the pedicles of plaintiff's spine, on this record, no reasonable juror would find that Dr. Weber's decision to use TSRH screws for pedicle surgery on the plaintiff was the result of Danek's alleged illegal marketing scheme. Accordingly, for the reason that a link in the tenuous chain of causation is found to have been definitively broken by Dr. Weber's conscious, deliberate and informed decision to use the TSRH System, defendant's motion for summary judgment of plaintiff's per se negligence claim on the basis of Danek's alleged illegal promotion is granted.

**(5)**

■ Defendant's motion for summary judgment on what appear to be misbranding claims must also be granted because, as discussed above in section (1), Danek provided adequate warnings about the risks associated with the use of its spinal screw systems, and the package insert expressly stated that the TSRH spinal screws were for use in the sacrum only. Plaintiff's remaining per se negligence claims must also be dismissed. Plaintiff raised a total of twenty-nine per se negligence claims for alleged violations of the FDCA and MDA's. Many of these claims relate to the significant issues of illegal promotion and misbranding and have already been addressed. The remaining per se negligence claims about, for example, lack of proper tests and consents do not appear to warrant discussion. Plaintiff has not offered any credible evidence that

Danek failed to perform required tests on the safety and efficacy of the TSRH Spinal System when used in the pedicles of the spine. While in plaintiff's memorandum of law and at oral argument plaintiff's counsel argued that defendant has failed to perform such tests, there is no evidence in a thick record that this is, in fact, the case. In addition, plaintiff has provided no evidence that Danek was even required to obtain a consent from plaintiff, or that Danek otherwise violated any other provisions of the FDCA's or MDA's. While many of the twenty-nine per se negligence claims fall into one of the four categories that have been addressed, plaintiff's counsel did not raise the others in his briefs or at oral argument. To the extent that plaintiff has failed to submit any supporting evidence for such claims,[14] these claims are also deemed to be abandoned. Accordingly, defendant is entitled to summary judgment on the remaining per se negligence claims.

Finally, as to the Sitas' remaining claims, plaintiff Beverly Sita's claim for loss of consortium obviously fails in light of plaintiff Michael Sita's inability to establish any actionable conduct on the part of defendant. Plaintiffs have also failed to make out a claim of negligent infliction of emotional distress for the reason that plaintiff Michael Sita has not established negligence on the part of Danek. Accordingly, defendant's motion for summary judgment is granted as to both of these claims.

### Conclusion

For the foregoing reasons, defendant's motion for summary judgment is granted as to each of plaintiffs' claims. To the extent that plaintiffs seek injunctive relief, such relief, in light of the principal conclusions, is denied as moot. The Clerk of the Court is directed to enter judgment in conformity with this opinion and close the case.

SO ORDERED.

---

14. Plaintiff's additional per se negligence claims include, for example: the failure to inform plaintiff that the alloy used in the TSRH System was unsuitable for use in the human body since such use would result in "allergic and other systemic reactions"; failure to warn plaintiff that the pedicle screws implanted into him were "unable to withstand a sufficient number of fatigue cycles"; failure to advise plaintiff that the pedicle screw contained an "inherent weakness"; failure to advise the public of the nature and risk of the spinal implantation procedure; failing to adhere by "the signed agreement" with the FDA; the failure to warn that the TSRH System and its component parts were defective; the failure to warn plaintiff that the alloy used in the TSRH screws was of insufficient strength to be fit for its intended use; and the failure to adhere to and abide by the provisions of 21 U.S.C. § 301, *et seq.* and the MDA's to that Act. *See* Complaint, ¶ 33.