**Donna PROHASKA and Thomas Prohaska, Plaintiffs,**

v.

**SOFAMOR, S.N.C., f/k/a Sofamor, S.A.; Sofamor, Inc.; Sofamor–Danek Group, Inc., Defendants.**

**No. 97–CV–292C.**

United States District Court, W.D. New York.

March 31, 2001.

Levin, Fishbein, Sedran & Berman (Fred Longer, of counsel), Philadelphia, PA, for Plaintiffs.

Pepper, Hamilton LLP (Philip H. Lebowitz, of counsel), New York City, for Defendants.

## DECISION AND ORDER

CURTIN, District Judge.

### *INTRODUCTION*

On April 18, 1997, plaintiff Donna Prohaska ("Mrs. Prohaska,")[1], a New York resident, brought this diversity action against Sofamor, S.N.C. (f/k/a Sofamor, S.A.), Sofamor, Inc., and Sofamor–Danek Group, Inc. Mrs. Prohaska alleges that she has suffered severe and permanent physical harm arising from defects in the Cotrel–Dubousset ("C–D") internal fixation system,[2] manufactured by Sofamor S.N.C., that had been implanted in her spine. Item 1. The device consisted of rods placed alongside and affixed to the posterior spine by means of screws which were attached to the pedicles[3] of her spine. Defendants filed an answer on September 25, 1997. Item 2.

1. Thomas Prohaska, Donna Prohaska's husband, is also a plaintiff in this action and seeks damages for loss of consortium as a result of the injuries suffered by Mrs. Prohaska.

2. The Cotrel–Dubousset Spinal Instrumentation System "consists of a variety of rods, hooks, screws, transverse traction devices, and connection components. These components come in varying sizes so that a surgeon can choose appropriately sized components in creating a construct best suited to a particular patient's anatomy and medical condition." Item 20, Exh. F, ¶ 4, Affidavit of Brian Gooden, Sofamor S.N.C. Regulatory Department Manager. Exhibit G shows a drawing of the C–D device.

3. Pedicles are "the bony structures that extend posteriorly (towards the rear of the body) from each vertebrae. The spinal fixation systems at issue in these cases consist of plates or rods which are affixed to the spine by means of bone screws inserted into the pedicles of the spine." *In re Orthopedic Bone Screw Products Liability Litigation*, MDL 1014, 1996 WL 107556 n. 3 *5 (E.D.Pa. Mar. 8, 1996). In spinal fusion surgery, bone graft material is placed between two mobile vertebrae in order to create an immobile mass, thereby decreasing or eliminating pain caused by vertebrae moving in opposite directions. Internal fixation instruments are used to provide stability to decrease motion between segments of the spine to allow the bone fusion to knit together. If a solid fusion is obtained, the device can be removed. Item 17, ¶¶ 24, 25.

This action was one of over 2,000 cases filed nationwide in which plaintiffs alleged they were injured by pedicle screw devices. Pursuant to an Order of the Judicial Panel on Multidistrict Litigation, this case [4] was transferred to the United States District Court for the Eastern District of Pennsylvania, where it was consolidated with the other cases and docketed as part of *In Re Orthopedic Bone Screw Products Liability Litigation*, MDL Docket No. 1014. While the case was in that court, the parties completed all factual discovery and all generic expert discovery, *i.e.*, discovery of general expert opinion regarding "the overall science associated with the use of screws in pedicles of the spine...." *In re Orthopedic Bone Screw Products Liability Litigation*, M.D.L. 1014, 1998 WL 118060 at *6 (E.D.Pa.1998). The case was remanded to this court on January 22, 1999 for disposition on the merits. On January 28, 2000, defendants filed a motion for summary judgment with supporting exhibits (Items 13, 17, 18, 19, 20, 21, 22, 23) and a motion to strike the opinion of plaintiffs' expert, Dr. Austin (Items 14, 15, 16). On May 17, 2000, plaintiffs filed a response opposing the motions (Items 30, 31, 32, 33, 34); defendants filed a reply on May 6, 2000 (Items 36, 37, 38), and plaintiffs filed an unopposed motion for leave to file a sur-reply (Item 39) on June 30, 2000.

The court heard oral argument on defendants' motion for summary judgment and motion to strike the opinion of plaintiffs' expert on November 3, 2000. Having considered the parties' arguments, summary judgment is granted to the defendants on all causes of action.

**4.** Four other New York cases were transferred to the Eastern District of Pennsylvania as well: *McLellan v. Sofamor–Danek Group, Inc.*, 1999 WL 222591 (W.D.N.Y. Apr. 12, 1999); *Lawrence v. Sofamor, S.N.C.*, 1999 WL

## BACKGROUND

Plaintiff Donna Prohaska, born on June 27, 1947, had known she had curvature of the spine since age 13. In October 1976, she was diagnosed with severe thoracolumbar scoliosis. Item 20, Exh B, DDP–009–000028, DDP–007–000010. In November 1977, her right shoulder was an inch higher than the left, and she had a leg length discrepancy of about one-half inch. *Id.*, DDP–009–000026. In 1984, x-rays revealed that Mrs. Prohaska's spine curve became more pronounced at 66 degrees. *Id.*, DDP–007–000010. Her diagnosis at the time was idiopathic adolescent scoliosis. *Id.* By 1984, she was diagnosed with idiopathic adolescent scoliosis, degenerative arthritis, and respiratory compromise. *Id.*, DDP–007–000010. She also had the onset of osteoarthritis and osteoporosis, and was becoming shorter. Item 20, Exh D; Exh B, DDP–206–000030, DDP–007–000010. In the hopes of addressing the problem, on June 29, 1984, she underwent spinal fusion surgery with Harrington segmental spinal instrumentation, which Dr. Charles Nash placed along the length of her spine. Item 20, Exh B, DDP–007–000017. After surgery afforded a reduction in the curvature of her spine, Mrs. Prohaska was placed in a body cast. When the cast was removed, doctors noted disc narrowing, mild spondylotic changes, and lateral spurs. *Id.*, DDP–007–000032. In 1985, Mrs. Prohaska complained of irritation and back discomfort and, in 1986, described occasional radiating pain tingling into both lower extremities, toes, and fingers. *Id.*, DDP–007–000007, DDP–009–000023. On a visit to Dr. Nash's office on June 9, 1987, Mrs. Prohaska complained of "some aches and pains along with tingling

592689 (N.D.N.Y. Aug. 2, 1999); *Loewy v. Stuart Drug & Surgical Supply, Inc.*, 1999 WL 76939 (S.D.N.Y. Feb.11, 1999); *Sita v. Danek Medical, Inc.*, 43 F.Supp.2d 245 (E.D.N.Y. Mar. 29, 1999).

and pulling along the heel areas bilaterally." *Id.*, DDP–007–000006. Because of Mrs. Prohaska's continued pain and because the fusion was stable, Dr. Nash felt it was appropriate to remove the Harrington instrumentation. The explantation took place on April 28, 1988. *Id.*, DDP–007–000006, DDP–007–000016, DDP–204–000240.

In May 1991, Mrs. Prohaska was referred to Dr. Edward Simmons, one of Buffalo's leading spine surgeons. She complained of persistent fatigue and noted that her back pain had continued to increase since the removal surgery. *Id.*, DDP–002–000003, DDP–002–000014; Exh. C, p. 208. She experienced flare-ups that made it difficult to work as a singer and choir conductor. Item 20, Exh. B., DDP–002–000014. Dr. Simmons noted her degree of scoliosis was increasing, and surmised that her lower back pain may be due to possible pseudarthrosis [5] and degenerative changes at the L3–4 and L4–5 levels. *Id.*, DDP–002–000015. Dr. Simmons referred her to a physical therapist. She had difficulty tolerating the therapeutic and conditioning exercises, and was eventually discharged due to erratic attendance. *Id.*, DDP–004–000005, DDP–004–000006. In 1991, Mrs. Prohaska was found to be disabled under the Social Security Act, although she did not begin receiving benefits until 1993. Item 20, Ex. D, p. 5.

Mrs. Prohaska continued to meet with Dr. Simmons and reported that her pain was worsening and was aggravated by walking, lifting, and prolonged sitting. Item 20, Ex. C, p. 205. Dr. Simmons suggested the possibility of another fusion surgery. *Id.*, p. 210. Mrs. Prohaska agreed to undergo the surgery. During a pre-surgery hospital visit on December 10, 1991, Mrs. Prohaska stated that she experienced pain in her lower back radiating to her neck and shoulder. She claimed that the pain had gradually worsened, that she had numbness and tingling in both thighs, arm, toes, and fingers, arthralgia, and irritable bowel syndrome. Item 20, Exh. B, DDP–203–000011, 13–16. On December 16, 1991, she signed an informed consent form authorizing Dr. Simmons to perform a lumbar two-four fusion with C–D instrumentation. Item 20, Ex. E. She said that Dr. Simmons never talked to her about the instrumentation that would be implanted, although she assumed that "as long as I was having a fusion that something would probably be in there to stabilize the spine." Item 20, Exh. C, p. 212. The surgery took place at Buffalo General Hospital on December 17, 1991. When he attached the C–D construct to Mrs. Prohaska's spine, Dr. Simmons used six screws, including Sofamor 36031L vertebral pedicle screws, in Mrs. Prohaska's lumbar pedicles. Item 20, Ex. H, DDP–203–000034. Her condition on discharge was good. Item 20, Exh. B, DDP–203–000003.

In March 1992, x-rays showed the instrumentation in good position and the fusion consolidating well. *Id.*, DDP–002–000009. Mrs. Prohaska underwent another regimen of physical therapy which she had difficulty tolerating. *Id.*, DDP–004–000013. Since the surgery, Mrs. Prohaska complained of burning back pain, continual and uncontrollable diarrhea, and chronic pain throughout her torso, arms, and legs. *Id.*, DDP–206–000013; Exh. C, p. 230, 231; Exh. D; Schedule H(c), (k), (s). In the winter or spring of 1992, Mrs. Prohaska began to suspect that the surgery did not work. During a visit to Dr. Simmons'

---

**5.** Pseudarthrosis refers to a failure or lack of fusion. *Cali v. Danek Med. Inc.*, 24 F.Supp.2d 941, 945 (W.D.Wis.1998).

office, she saw x-rays of her spine, which showed the instrumentation, and she asked him "[C]an't all of those screws be causing all of this problem?" Dr. Simmons responded in the negative. She then asked why she was having so many more problems with this surgery than with previous ones, and he answered, "I had to rotate your spine.... I had to literally turn it, so your recovery time is going to be longer." Item 20, Exh. C, p. 233.

In 1994, Mrs. Prohaska joined a back support group called Citizens Against Pedicle Plates and Screws (CAPPS). *Id.*, p. 237. Because her pain continued, she met with Dr. Menkowitz in December of 1995. He told her that the instrumentation was causing her pain, and Mrs. Prohaska agreed to undergo explant surgery. *Id.*, p. 256. When the explantation surgery took place on December 20, 1995, the fusion was found to be solid. Item 17, ¶ 43; Testimony of Dr. Austin, Item 20, Exh. I, p. 46.

Mrs. Prohaska was seen by Dr. John Noe in March 1994, who diagnosed her with fibromyalgia.[6] Dr. Simmons concurred in an April 1994 letter to another doctor. Item 20, Exh. L, p. 4. On May 22, 1996, Dr. Frederick Elliot diagnosed Mrs. Prohaska as suffering from arachnoiditis.[7] *Id.*, p. 5.

### Standard for Summary Judgment

Summary judgment is appropriate where the evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). To avoid summary judgment, the non-moving party must present evidence such that "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). While the movant bears the initial burden of showing that no genuine issue of material fact exists, he need not negate every allegation made by his opponent's case. Movant's motion should be granted if a showing is made that the non-moving party has failed to establish one of the elements essential to her cases. *Celotex v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### DISCUSSION

Mrs. Prohaska has filed several claims against defendants, including Fraudulent Marketing and Promotion, Negligent Misrepresentation, Strict Liability, Liability Per Se, Negligence, and Breach of Implied Warranty of Merchantability. Mr. Prohaska asserts a claim for Loss of Consortium. Although plaintiffs' response brief addresses allegations of fraud perpetrated against the FDA, plaintiffs never pleaded a Fraud–on–the–FDA count in their complaint and never amended their complaint to so plead. The parties entered into a stipulation filed in this court on March 10, 2000 that the only claims asserted by

---

6. Fibromyalgia is "a condition of general physical malaise consisting of musculoskeletal pain and stiffness, spasms, fatigue, and severe sleep disturbances." *Fitzgerald v. Smith & Nephew Richards, Inc.*, 1999 WL 1489199 at *1 (D.Md. Dec. 30, 1999).

7. Arachnoiditis is "the inflammation of membranes covering the spinal cord." *Johnson v. Com'r of Social Security*, 210 F.3d 372, 2000 WL 332059 at *3 (6th Cir. Mar. 22, 2000) (unpublished opinion) (citing *Dorland's Illustrated Medical Dictionary*, 125–26, 25th Ed. (1974))

plaintiffs were those contained in their April 13, 1997 complaint. Item 27.

## A. Procedural issues

### 1. Res Judicata/Collateral Estoppel

On December 9, 1994, Donna and Thomas Prohaska filed a complaint in the New York State Supreme Court, Niagara County, against Buffalo General Hospital, Stuart Medical Specialty, Inc., Danek Medical, Inc., Sofamor Danek Group, Inc., and Sofamor, Inc. Plaintiffs complained of injury to Donna Prohaska resulting from implantation of the C–D spinal fixation device. The causes of action pled included Negligence, Fraud and Misrepresentation, Strict Liability, Express Warranties, Punitive Damages, and Failure to Warn. Item 20, Exh. N. On July 1, 1997, plaintiffs and defendants signed a Stipulation Discontinuing Action, in which the action was "discontinued with prejudice on the merits." Item 20, Exh. O.

■ The doctrine of res judicata, or claim preclusion, holds that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 284–85 (2d Cir.2000) (citations omitted). "Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." *Id.* Res judicata bars a second, federal court action involving the same claims between the same parties as the first, state court matter. *Restatement (Second) of Judgments* § 24(1) (1982).

Given that plaintiffs discontinued the state court action on the merits, they are barred from maintaining this federal court action involving the same claims between the same parties. In addition, they are barred from asserting additional claims against those same parties that could have been raised in the state court action. Plaintiffs do not offer any rebuttal to defendants' res judicata argument. Thus, the claims against defendants Sofamor–Danek Group, Inc. and Sofamor, Inc. are dismissed on the basis of res judicata. The only remaining defendant in this action is Sofamor, S.N.C., f/k/a Sofamor, S.A.

### 2. Statute of Limitations

New York applies a three-year statute of limitations to personal injury and strict liability actions, CPLR § 214, a six-year statute of limitations to actions based on fraud, CPLR § 213, and a four-year statute of limitations for breach of warranty of merchantability. Defendants claim that this action by plaintiffs is time-barred by the statute of limitations.

#### a. Discovery Argument

■ Plaintiffs and defendants agree that the statute of limitations prescribed by CPLR § 214–c(2) governs implantations. Section 214–c provides that the three-year period within which an action to recover damages for personal injury shall be computed from the date of discovery of the injury by the plaintiff or from the date when plaintiff should have discovered the injury by exercising reasonable diligence. The parties differ on what the correct discovery date is.

Defendants cite *Wetherhill v. Eli Lilly & Co.*, 89 N.Y.2d 506, 655 N.Y.S.2d 862, 678 N.E.2d 474 (1997) for support that the date of the "discovery of the injury" under

CPLR 214–c(2) is the date the plaintiff discovered the primary condition on which the claim is based, *i.e.*, when the plaintiff knew about the medical condition forming the basis of her claim. *Id.* at 509, 511, 655 N.Y.S.2d 862, 678 N.E.2d 474. They cite references in the record wherein Mrs. Prohaska remarked upon her increased pain since the December 17, 1991 operation. Item 20, Exh. D, Questionnaire Responses; Schedule H(c), (k), (s); Exh. B, 206–000013; Exh. C, pp. 230–31. In January 1992, Mrs. Prohaska wondered whether the cause of her pain was the instrumentation, since "something didn't seem right almost immediately...." Item 20, Exh. D, Questionnaire Response #26; Exh. C, p. 233–34. She felt the burning pain by March 1992, "within the first several months" since surgery, and described that burning pain as "different" in nature from the other pain she had experienced. Item 20, Exh. C, p. 231. Based on these facts, defendants assert that Mrs. Prohaska discovered her injury by January 1992 at the latest, and that her claims were time-barred by 1995 at the latest.

In addition, defendants argue that CPLR § 214–c(4), which allows an additional one-year extension of the statute of limitations upon discovery of the cause of the injury if discovery of the cause occurred less than five years after discovery of the injury itself, is inapplicable. Asserting that the filing of the December 9, 1994 action in state court was the latest date on which Mrs. Prohaska could claim she discovered the screws were causing her injury, and that date occurred within five years of her injury, she had one additional year, until December 9, 1995, to commence this suit. Since she sat on her rights until April 13, 1997, the date of the filing of the federal court suit, her claims are time-barred.

Plaintiffs contend that New York applies a three-year statute of limitations for personal injury actions, which begins to run when plaintiff realizes she suffered at the hands of another and that her injury was due to a human cause. Concerning the date of discovery, plaintiffs deny that Mrs. Prohaska "very quickly realized that the surgery did not work" and testified that in the winter or spring of 1992, she began to "suspect" her surgery did not work. Item 31, ¶ 56. When she asked Dr. Simmons about it, he dismissed the hardware as the cause of the problem. Item 20, Exh. C, p. 233. Plaintiffs also point out that Mrs. Prohaska testified that two or three months following her surgery, she had "no idea" as to what was the cause of her pain. *Id.*, pp. 232–33.

In addition, plaintiffs claim that the statute of limitations in this suit was tolled from Dec. 30, 1993 to Feb. 22, 1995 pursuant to the class-action tolling rule. They cite *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974), and *Crown Cork & Seal Co. v. Parker,* 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), in support of this claim. Further, plaintiffs argue that the "two-injury rule"[8] is applicable to extend the statute of limitations. In response, defendants assert that *American Pipe* does not apply to save plaintiffs' claims and that the two-injury rule is inapplicable.

A genuine issue of material fact exists as to when Mrs. Prohaska "discovered" her injury. Because there is a difference in discovery dates pointed to by both plaintiff and defendant, such a finding would otherwise bar summary judgment for defendants on this issue. However, if it can be shown that discovery of Mrs. Prohaska's injury occurred within a time frame where

---

8. See definition, *infra,* Section b.

the plaintiffs' complaint would still be time-barred, this issue could be determined as a matter of law.

Plaintiffs' contentions about time of discovery relate to the time when Mrs. Prohaska suspected the instrumentation caused her injury, that "her medical problem was 'caused' by something extrinsic to her biology." *Braune v. Abbott Laboratories,* 895 F.Supp. 530, 545 (E.D.N.Y.1995). Plaintiffs do not consider Mrs. Prohaska's awareness of a new type of pain as indicating 'discovery.'

Defendants counter that the *Braune* reasoning was rejected by the New York Court of Appeals in *Wetherill* two years later. In *Wetherill,* an injury was deemed discovered, and the statute of limitations would begin to run on the date the physical condition forming the basis of the personal injury action became known to the plaintiff, regardless of whether the cause of injury was known at that point. *Id.* at 509, 514, 655 N.Y.S.2d 862, 678 N.E.2d 474.

On page 26 of their memorandum of law (Item 30), plaintiffs state that Mrs. Prohaska "was unaware of her injury until sometime after the spring of 1992." This is the only direct statement by plaintiffs concerning the discovery of the injury. Even so, it is phrased in the negative, which creates ambiguity. Given Mrs. Prohaska's testimony, and resolving all ambiguities and drawing all reasonable inferences in her favor as the nonmoving party on summary judgment, it is reasonable that she discovered her injury by summer or fall of 1992. On a June 19, 1992 doctors visit, she attributed her back pain to the pedicle screws and said she thought she had an "infected spine." Item 20, Exh. B, DDP–202–000004. *See also* Item 20, Exh. D; Schedule B, # 26; Schedule H, (f), (g), (h), (i), (k), (*l* ), (n), (o), (p), (q), (r), (s), (t), (x). Given these facts, her claims relative

to the three-year statute of limitations are time-barred under CPLR section 214–c(2).

CPLR § 214–c(4) also does not help Mrs. Prohaska. As defendants point out, it is undisputed that Mrs. Prohaska was aware of the cause of her injury by December 9, 1994, when she filed the State Court action. Because the alleged cause of her injury was discovered within five years of that injury, she had one additional year, until December 9, 1995, to commence suit. *In re Pfohl Brothers Landfill Litigation,* 68 F.Supp.2d 236, 247, 248 (W.D.N.Y. 1999). Because the federal suit was filed in 1997, the provisions of CPLR § 214–c(4) also do not assist Mrs. Prohaska.

Since Mrs. Prohaska's claims would be time-barred pursuant to CPLR § 214–c(2) and (4), it is necessary to analyze whether the second injury rule and federal class-action tolling rule might save her causes of action.

**b. Second–Injury Rule**

The second-injury rule provides that

> Where the statute of limitations has run on one exposure-related medical problem, a later exposure-related medical problem that is 'separate and distinct' is still actionable under New York's second injury rule. Under the rule, diseases that share a common cause may nonetheless be held separate and distinct where their biological manifestations are different and where the presence of one is not necessarily a predicate for the others development.... The progression of a single disease or condition into a more serious or debilitating form does not, however, give rise to an actionable second injury.

*Bartlett v. Moore Business Forms, Inc.,* 2000 WL 362022 at *6 (N.D.N.Y. Mar. 30, 2000) (citations omitted). Plaintiffs assert

that Mrs. Prohaska's arachnoiditis, which did not manifest until December 1995, is a separate and distinct injury from fibromyalgia. Item 30, p. 26. This would expand the statute of limitations, and the arachnoiditis would remain actionable under the second-injury rule.

The flaw in plaintiffs' argument is that they have not offered any expert evidence to show that either fibromyalgia or arachnoiditis is separate and distinct from the various conditions that Mrs. Prohaska suffered from prior to her December 1991 implantation, or from each other. Further, they have not discounted that these injuries may be progressions of her condition into a more debilitating form. Plaintiff's expert, Dr. Austin, does not characterize Mrs. Prohaska's arachnoiditis as a separate and distinct injury, but as part of a "chronic pain syndrome" package. In his report, he opined:

> It is my opinion that the patient's fibromyalgia and her arachnoiditis cause her to have a chronic pain syndrome which . . . causes her to have a permanent and total disability. . . . In conclusion, it is my opinion that her chronic pain syndrome is caused by the failure of the instrumentation to withstand the forces of bending, twisting, reaching, etc., and she is now left with arachnoiditis and fibromyalgia.

Item 20, Exh. P, p. 2.

In addition, plaintiffs offer a conclusory statement that arachnoiditis is a separate and distinct injury and occurred at a later date than the fibromyalgia. Item 30, p. 26. In *Humphreys v. Humphreys*, 949 F.Supp. 1014, 1020 (E.D.N.Y.1997), the District Court granted summary judgment on statute of limitations grounds because plaintiff's allegations were unsupported by evidence that the two sets of injuries were unrelated. For these reasons, the court finds the second injury rule does not apply to extend the statute of limitations.

### c. Class–Action Tolling

■ On December 30, 1993, a class action suit against Sofamor, S.N.C., entitled *Zampirri v. Sofamor, S.N.C.*, 93–CV 7074 (E.D.Pa.), was filed in federal district court. Item 20, Exh. 29. Plaintiffs claim Mrs. Prohaska "was a putative member of the class." Item 30, p. 24. Class certification was denied on February 22, 1995. Item 20, Exh. 30. *Orthopedic Bone Screw Products Liability Litigation*, MDL1014, 1995 WL 273597 (E.D.Pa. Feb. 22, 1995). Plaintiffs contend that the class action rule tolls the statute of limitations from the time of filing until the resolution of a motion for class certification, and cite *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974); and *Crown, Cork & Seal Co., Inc. v. Parker*, 462 U.S. 345, 103 S.Ct. 2392, 76 L.Ed.2d 628 (1983), in support of their position.

*American Pipe* stands for the proposition that "the commencement of the original class suit tolls the running of the statute [of limitations] for all purported members of the class who make timely motions to intervene after the court has found the suit inappropriate for class action status." *American Pipe*, 414 U.S. at 553, 94 S.Ct. 756. *Crown Cork* expanded the rule in holding that "the filing of a class action tolls the statute of limitations as to all asserted members of a class whether they choose to *intervene* or file '*individual actions*' following the denial of class certification." *Korwek v. Hunt*, 827 F.2d 874, 877 (2d Cir.1987).

Defendants proffer two arguments against class-action tolling: (1) in diversity cases, under *Erie v. Tompkins*, state statutes of limitations, not federal class-action tolling rules, apply, and (2) even if class-

action tolling did apply, it would not save plaintiffs' claims.

Defendants cite *Ragan v. Merchants Transfer & Warehouse Co.*, 337 U.S. 530, 533, 69 S.Ct. 1233, 93 L.Ed. 1520 (1949) for the proposition that, in this common law personal injury action based upon diversity of citizenship, New York substantive law, including statute of limitations rules, applies. This view is confirmed in *17 Moore's Federal Practice 3d*, § 124.03, "Determining Scope (Pertinence) of Federal Rule Under Rules Enabling Act Test," pp. 19–20, which notes:

> State statutes of limitations are substantive rules of law for *Erie* purposes. When jurisdiction is based on diversity of citizenship, a federal court is obliged to apply a state statute of limitations. In addition ... state rules that are an integral part of the statute of limitations, such as tolling rules, apply to state claims brought in federal court.

*See also Ellenbogen v. Rider Maintenance Corp.*, 794 F.2d 768, 772–73 (2d Cir.1986) ("In a diversity case, the rule of *Erie* ... intends that the outcome should be the same in federal court as if the litigation were tried in state court."). If federal class-action tolling is not applicable, plaintiffs' claims are time-barred.

Secondly, defendants point out that in New York, "class action tolling is inapplicable where, during the pendency of the class action petition, the plaintiff files his/her own individual lawsuit," citing *Wahad v. City of New York*, 1999 WL 608772 (S.D.N.Y. Aug. 12, 1999). Item 36, p. 5. *Wahad* explores the reasoning behind *American Pipe's* tolling provision: If plaintiffs were not protected by the tolling, they would be compelled to file their own motions to intervene in order to preserve their rights to participate in the litigation. This would "frustrate the efficiency and economy goals of [Rule 23] class action

litigation." *Wahad*, 1999 WL 608772 at *5. *Wahad* also noted that *American Pipe/Crown Cork* relied on the existence of the class prior to a decision on certification to protect their rights, and the only efficient way to protect a plaintiff who has justifiably relied is to grant a toll. *Id.* at *6. Otherwise, if the class was not certified and the statutes of limitations had expired, the plaintiff who had relied upon the class action would be unprotected.

These notions of efficiency and reliance are integral to class-action tolling. But in this case, similar to *Wahad*, plaintiffs did not rely upon the class action.

> Rather than wait for the decision granting certification ... plaintiff filed his own action.... By filing his own lawsuit, plaintiff affirmatively demonstrated his choice not to rely on the class action mechanism.... [B]y filing this action and not relying on the ... class, plaintiff created the very inefficiency that American Pipe sought to prevent—he generated more litigation and expense concerning the same issues that were litigated by a class of which he was a member. Accordingly, plaintiff is not entitled to the benefit of a toll under American Pipe.

*Id.* at *6.

While the *Zampirri* class action was pending, the Prohaskas filed their state court action. This fact demonstrates that they were not relying on their possible participation as class members in the *Zampirri* suit in order to find relief. Neither did the Prohaskas serve the efficiency goals of Rule 23 by filing a separate action in state court. For these reasons, plaintiffs are not entitled to class-action tolling in the case at bar.

### d. Statute of Limitations for Fraud

■ Plaintiffs assert that the six-year statute of limitations applicable for fraud

causes of action under CPLR § 213(8) should govern their "Fraudulent Misrepresentation and Marketing" claim. Claims of fraud must be brought within two years of the time the plaintiff discovered or could have discovered the fraud, or within six years of the time the fraud was committed, whichever is later. *Netzer v. Continuity Graphic Associates, Inc.*, 963 F.Supp. 1308 (S.D.N.Y.1997). However, it is well settled that the statute of limitations for fraud is only applicable where there would be no injury but for the fraud. Where allegations of fraud are only incidental to another cause of action, fraud statute of limitations may not be invoked. *New York Seven–Up Bottling Co., Inc. v. Dow Chemical Co.*, 96 A.D.2d 1051, 466 N.Y.S.2d 478 (2d Dept.1983).

Mrs. Prohaska alleges personal injury arising from implantation of the C–D device. The fraudulent misrepresentation claim is incidental to her personal injury claim. The fraud statute of limitations does not apply here. *See Larkins v. Glaxo Wellcome, Inc.*, 1999 WL 360204 at *10 (E.D.N.Y. May 20, 1999) (a failure to warn claim is governed by the three-year statute of limitations).

### e. Equitable Tolling

■ Plaintiffs argue that equitable tolling standards should apply to all claims in this case. Equitable tolling is applied when some "affirmative act of fraudulent concealment frustrated discovery [of the cause of action]," which allows tolling of the statute of limitations. *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 461 (2d Cir.1974). Plaintiffs assert that "the statute should be tolled because Mrs. Prohaska had absolutely no opportunity to learn of the general fraudulent scheme relating

to the 36031L screw." Item 30, p. 30. However, as defendants point out, Count Two of Mrs. Prohaska's 1994 state court complaint, entitled "Fraud and Misrepresentation" included an allegation that the C–D system was not approved and manufacturers withheld information from the consuming public and from the FDA. Plaintiffs also contend that the information concerning the 36031L screw was not produced until 1998, and that was the first opportunity plaintiffs had to discover their fraud cause of action. However, plaintiffs pleaded their fraud claims in this case in April 1997. In addition, the court dismissed the fraudulent marketing and promotion claim (*infra*, Section D). The fraudulent concealment claim fails, and equitable tolling is inapplicable.

### B. Substantive Issues

Although the court has found that the procedural problems presented by this case, notably plaintiffs' running afoul of the statute of limitations, would provide grounds for dismissal, at the same time the court feels it important to address the merits of the case.

### 1. Causation

■ Defendants argue that plaintiff has failed to offer sufficient proof of causation to survive a motion for summary judgment.[9] Under settled New York law, " 'whether the action is pleaded in strict products liability, breach of warranty or negligence,' the plaintiff in a products liability case bears the burden of establishing 'that a defect in the product was a substantial factor in causing the injury.' " *Sita v. Danek Medical, Inc.*, 43 F.Supp.2d 245, 252 (E.D.N.Y.1999) (cases omitted). Causation must also be proved in fraud, mis-

9. The majority of district courts, when considering MDL Bone Screw cases on remand, have found causation lacking. *See Minisan v.*

*Danek Medical, Inc.*, 79 F.Supp.2d 970, 975 (N.D.Ind.1999) (citations therein).

representation, breach of warranty, and per se negligence claims. *Id.* Also, under New York law, when the determination of whether an injury was caused by some event or conduct is "presumed not to be within common knowledge and experience," competent medical opinion evidence is necessary to enable a jury to find the requisite causation. *Fane v. Zimmer, Inc.*, 927 F.2d 124, 131 (2d Cir.1991) (citation omitted).

Plaintiffs have named Dr. Donald C. Austin and Harold Alexander, Ph.D., as their causation expert witnesses. In support of plaintiff's opposition to defendant's motion for summary judgment, plaintiff submits a two-page report produced by Dr. Austin, dated May 18, 1999 (Item 20, Exh. P) and a ten-page report by Dr. Alexander dated May 20, 1999 (Item 20, Exh. J).

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), is the seminal case on the admissibility of expert testimony. Under *Daubert*, in order for evidence to be admissible, the court first reviews an expert's qualifications and then, acting as a "gatekeeper" with respect to scientific evidence, evaluates the expert's scientific opinions and methodology for reliability and relevancy. *Id.*, pp. 590–94, 113 S.Ct. 2786. Such evidence is admissible by a preponderance of the evidence. *Id.* at 593 n. 10, 113 S.Ct. 2786.

### 2. Dr. Austin

In his report, Dr. Austin recites the records he reviewed in preparing the report,[10] summarizes his credentials, relates that he is "well acquainted" with Sofamor as well as other spinal instrumentation "even though I do not personally install it myself surgically," notes that solid fusion was obtained in Mrs. Prohaska's back "even though the screws had broken," summarizes the findings of Dr. Alexander concerning alleged defects in the C–D system, and concludes that Mrs. Prohaska's "chronic pain syndrome is caused by the failure of the instrumentation to withstand the forces of bending, twisting, reaching, etc., and she is now left with arachnoiditis and fibromyalgia." To arrive at his conclusion, he asserts that he has "done a differential diagnosis and [has] ruled out any other causes of Mrs. Prohaska's pain syndrome...." Item 20, Exh. P, p. 2.

Defendants have filed a motion to exclude the testimony of Dr. Austin on the grounds that he is unqualified and that his opinions and testimony are unreliable.

### a. Qualifications

■ In the Second Circuit, only a "witness qualified as an expert by knowledge, skill, experience, training or education may give opinion testimony." *Bunt v. Altec Indus. Inc.*, 962 F.Supp. 313, 316 (N.D.N.Y.1997). Although Federal Rule of Evidence 702 does provide a liberal and flexible approach to admissibility of expert testimony, the expert must still be "reasonably confined to his subject of expertise." *Id.* at 317. In other bone screw litigation cases, experts who "lack[ ] both experience and expertise in the use of

---

**10.** The records included: (1) office records of Dr. Simmons; (2) office records of Dr. Nash; (3) records of Kenneth Kurtz and Associates, Physical Therapy Facility; (4) records from WNY Orthopaedic & Spine Therapy Group (5) Dr. John Noe (who diagnosed fibromyalgia); (6) the DeGraff Memorial Hospital Laboratory (7) North Towns Medical Group; (8) Dr. Myr- na S. Gallego; (9) Dr. Frederick Elliott; (10); Buffalo General Hospital admission; (11) Pottstown Memorial Medical Center (where plates & screws were removed); (12) Institute for Law Back and Neck Care where Mrs. Prohaska was treated by Dr. Charles Burton; (13) St. Luke's Hospital in Cleveland.

spinal fixation devices have been excluded." *Wilson v. Danek Medical, Inc.,* 1999 WL 1133320 at *5 (M.D.Fla. Mar. 29, 1999); *O'Brien v. Sofamar,* 1999 WL 239414 (E.D.Pa. Mar. 30, 1999); *Cali v. Danek Medical, Inc.,* 24 F.Supp.2d 941 (W.D.Wis.1998); *Leigh v. Danek Medical, Inc.,* 1998 WL 1041329 at *4–5 (N.D.Tex. Dec. 14, 1998).

Plaintiff's expert, Dr. Donald Austin, is a Board-certified neurosurgeon[11] with 35 years of experience. Item 20, Exh. I, Austin I,[12] pp. 9–10. He has not performed any neurological surgery since April 1997, following cancer treatment. *Id.,* p. 61. His area of specialty is "acoustic tumors of the brain and implantation of continuous infusion pumps into the spinal column for control of intractable pain" in cancer patients. *Id.,* p. 8. He is not trained to do lumbar fusions, the type of surgery at issue here. *Id.,* p. 6. In addition, he has not treated a scoliosis patient for the last ten years. *Id.,* p. 8. He has observed an orthopedic surgeon implant an internal fixation device only one or two times in the last ten years. *Id.,* pp. 7–8. He participated in one of the surgeries by performing the decompression, foraminotomy and removing a ruptured disc. *Id.,* p. 8. One of the surgeries involved the Stephi pedicle screw system. *Id.* He has never implanted or explanted an internal fixation device. *Id.* He testified at deposition that he could not distinguish a C–D from a TSRH ("Texas Scottish Rite Hospital") system, did not know the distinguishing features of the C–D system, did not know what components consti-

tuted a C–D system, and did not know how the pedicle screws were affixed. *Id.,* pp. 27–28. He has never designed an internal fixation device for use in the spine and never studied the biomechanics of internal fixation devices. Item 20, Exh. I, Austin II, p. 8.

Nevertheless, Dr. Austin stated in his report that he was "well acquainted" with Sofamor and other spinal instrumentation. He qualified his "well acquainted" characterization during his deposition as meaning "[a]s much as anyone would be who doesn't personally insert them and doesn't believe in them." *Id.,* p. 29.

Given this background, the court finds that Dr. Austin is not qualified as an expert by skill, experience, or training.

He also does not have sufficient knowledge or education to qualify as an expert. Prior to February 1999, when he became involved as an expert in another pedicle screw case, Dr. Austin admitted he had never undertaken a specific review of the medical literature concerning the safety and efficacy of spinal instrumentation and that he never read studies suggesting fusion rates are superior in instrumented versus uninstrumented procedures. *Id.,* pp. 104–07, 109–10. He said that he had reviewed medical peer literature and clinical data concerning safety and efficacy of internal fixation devices only at yearly major medical meetings which offer clinical symposiums and hands-on presentations. His general review of journals contained occasional articles on spinal instrumenta-

---

11. While he is Board-certified, the general membership of the American Association of Neurological Surgeons sustained its Board of Directors' decision to suspend his privileges for six months in 1997 because he was not up to date on the current literature concerning a particular type of surgery and misrepresented that his opinion was that of the profession generally. Item 20, Ex. I, pp. 10–18. Al-

though this point would go to credibility, and would thus be a jury issue, it is also relevant to the question of his qualifications.

12. Exhibit I (Item 20) contains two separate depositions of Dr. Austin. Reference will be made to Austin I, the deposition that took place on August 20, 1999; and Austin II, the deposition that took place on January 8, 2000.

tion. *Id.*, pp. 106–07. Plaintiff's Legal Committee (PLC) supplied him with a 231–page document which had been given to the FDA relating to pedicle screws. The document contained references to articles and medical texts relating to pedicle screws. Dr. Austin had not read the articles or reviewed the texts. Item 20, Exh. I, Austin II, pp. 16–17. Nevertheless, Dr. Austin answered in the affirmative that he accepted as "gospel" whatever was contained in the PLC's submission to the FDA, since "it's something that I have suspected all along and I think it fits with my own philosophy that this is a procedure that was primarily devised to make a lot of money for the instrument companies and the surgeons." Item 20, Austin I, pp. 101–02. He agreed that he is not in a position to weigh the credibility/reliability of data and conclusions in the PLC material. *Id.*, p. 105. In addition, Dr. Austin has no publications, presentations, or research on spinal fusion surgery and spinal instrumentation to his credit. Item 20, Exh. I, Austin I, p. 7.

The court in *Mancuso v. Consolidated Edison Co.*, 967 F.Supp. 1437, 1443 (S.D.N.Y.1997), criticized this type of litigation-driven expertise where a medical doctor, offered as an expert, relied upon the plaintiff's attorney to provide him with the relevant scientific literature. The court commented, "We cannot help but conclude that [plaintiff's expert] was not in fact an expert ... when he was hired by the plaintiffs, but that he subsequently attempted, with dubious success, to qualify himself as such by a selective review of the relevant literature." Litigation-driven expertise has been found to be a negative factor in admissibility. *See In re Paoli RR Yard PCB Litigation*, 35 F.3d 717, 742 (3d Cir.1994); *Burton v. Danek*, 1999 WL 118020 (E.D.Pa., Mar. 1, 1999). In *O'Brien v. Sofamor*, 1999 WL 239414 (E.D.Pa. Mar. 30, 1999), a neurologist with

strikingly similar shortcomings as Dr. Austin was found to be unqualified.

The record reflects that Dr. Austin lacks both practical and formal training, experience, and knowledge in the area of spinal fusion surgery as well as in the area of spinal fixation devices. Because of his dearth of knowledge in these areas, the court finds he is unqualified to render an expert opinion on causation.

### b. Reliability

█ The Supreme Court has held that Federal Rule of Evidence 702 requires that expert testimony be both reliable and relevant to be admissible. *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. Under *Daubert*, a district court must evaluate proffered expert testimony to determine if it is "(1) [based upon] scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at 592, 113 S.Ct. 2786. To that end, the trial judge must make a "preliminary assessment of whether the reasoning or methodology ... properly can be applied to the facts in issue." *Id.* at 592–93, 113 S.Ct. 2786. The Supreme Court explained that "the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id.* at 590, 113 S.Ct. 2786. The adjective "scientific" "implies a grounding in science's methods and procedures" while "knowledge connotes more than subjective belief or unsupported speculation." *Id.* The inquiry is into the methodology used, not the conclusions generated. *Id.* at 594–95, 113 S.Ct. 2786. Conclusory allegations of an expert "absent a statement of the facts upon which they are based, are as insignificant as the conclusory allegations of a party, his attorney, or any other witness." *Sweet v. Electronic Data Systems, Inc.*, 1996 WL 204471 at *6 (S.D.N.Y. Apr. 26, 1996). The expert must explain how

and why he reached his conclusion, and courts do not have to credit opinion evidence connected to data "only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*, 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

### i. Personal Examination

When determining whether a medical expert's methodology is reliable, courts have inquired into whether the expert employed the standard diagnostic techniques used in the medical profession. These techniques include personal examination of the patient, taking a thorough medical history, performing and reviewing appropriate diagnostic tests, and performing a thorough differential diagnosis. *Paoli*, 35 F.3d at 758. If experts depart from generally accepted scientific methodologies, courts will pay close attention to that fact when making their reliability inquiry. In some cases, it is most important that the expert conduct a physical examination of the plaintiff, and failure to do so will render the report unreliable. *Minisan v. Danek Medical*, 79 F.Supp.2d 970 (N.D.Ind. 1999) (expert did not examine plaintiff or device; conclusions based only on examination of records not reliable). Perhaps under the circumstances of this case a physical examination was not necessary, but Dr. Austin's other failures are substantial and render his report worthless.

Dr. Austin admitted he never examined Mrs. Prohaska or communicated with her in any way. Item 20, Exh. I, Austin II, p. 23. He did not read her deposition testimony or speak with any of her physicians. *Id.*, p. 24. He had not reviewed any of her x-rays, original MRIs, or CAT scans (only reports), and was in no position to disagree with the conclusion offered by the radiologist since he had not seen the original images. *Id.*, pp. 24–25. The only medical records Dr. Austin reviewed were supplied by plaintiff's counsel; and he did not ask for any additional records, nor did he know if he had seen all of the medical records relating to her low back pain. *Id.*, p. 25. The record reveals he did not examine the explanted C–D device, which he regarded as defective and the cause of Mrs. Prohaska's injuries, even though Mrs. Prohaska still had it in her possession. Item 20, Exh. C, p. 260.

In forming his opinion, Dr. Austin did not employ the methodology he regularly used to assess the condition of his own patients. Austin II, pp. 19–21. That gap, as other courts have found, is a negative admissibility factor and leaves the impression that he conducted a superficial analysis and not an extensive, first-hand review that would provide a reliable basis for the expert's conclusions.

### ii. Differential Diagnosis

Dr. Austin stated in his report that he had performed a differential diagnosis, which enabled him to reach his conclusion on causation. Differential diagnosis is "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir.1999). It requires a consideration of all the relevant potential causes of a plaintiff's symptoms and eliminating alternate causes based on a physical examination, clinical tests, and a thorough medical history.

A differential diagnosis is a "method and procedure of science." *Fitzgerald*, 1999 WL 1489199 at *3. A New York district court has noted that it was "not clear, however, that *Daubert* would require the type of exacting differential diagnosis that defendant contends [plaintiff's expert] was required to engage in here," *Sita*, 43 F.Supp.2d at 254, because *Daubert* allows

a 'flexible' test of reliability. *Id.* at 254 n. 7. However, the causation issues in *Sita* were not as complex as here, since an x-ray clearly revealed that one of the screws implanted in the pedicles of Sita's spine had fractured. Because the medical device fractured roughly contemporaneously with the time the patient complained of pain, the *Sita* court found that fact sufficient to defeat the defendant's summary judgment motion on the issue of causation. In that case, a thorough differential diagnosis was not necessary. In *Prohaska,* where no screw fractured, where Mrs. Prohaska's pain had lasted for years, and where the cause of her pain was more nebulous, the court finds that a differential diagnosis is a necessary component to determine causation under *Daubert.*

In order for conclusions drawn from a differential diagnosis to be admissible, the diagnosis must be conducted with "intellectual rigor." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). "Its underlying integrity requires professional thoroughness, and it must at least 'take serious account of other potential causes'." *Fitzgerald,* 1999 WL 1489199 at *3 (citation omitted).

Because he provides no other insight in his 1999 report as to what his differential diagnosis entailed, it is necessary to review Dr. Austin's deposition testimony to determine if he employed the requisite intellectual rigor to support his conclusions.

Dr. Austin was unable to rule out, to a reasonable degree of medical certainty, Mrs. Prohaska's preexisting condition, scoliosis, as a current cause of her pain. He admitted it was a "minor" cause. The exchange went as follows:

Q. Well how have you put it in the minor category?

A. It could cause some back pain, but it wouldn't cause the generalized pain that she has, pain that radiates down the legs.

Q Well, she had that before the operation in December 1991, didn't she?

A. Yes.

\* \* \* \* \* \*

Q. But you don't know what the cause of her radiating pain was before the December 1991 operation?

A. It was assumed by the physicians who were proposing the operation that it was due to the scoliosis.

Q All right. And do you accept—

A I'm not aware—sure, I agree with that. . . .

Item 20, Exh. I, Austin II, pp. 80–81.

This telling exchange not only has plaintiff's expert agreeing that plaintiff's radiating pain, allegedly caused by the C–D instrumentation, actually preceded the implantation surgery, but also agreeing that the *origin* of that pain was her chronic scoliosis. Dr. Austin's ruling *in* scoliosis during his deposition testimony on January 8, 2000 and ruling it *out* as a possible cause of plaintiff's chronic pain syndrome in his 1999 report reveals disconcerting causation and credibility gaps.

Dr. Austin also admitted that because the 1991 fusion surgery was a long fusion, this put unusual pressure on the spine and was a likely cause of Mrs. Prohaska's current pain. However, he sought to distinguish it from the "radiating pain" about which Mrs. Prohaska complained. *Id.,* p. 83.

The requisite scientific rigor was also lacking when Dr. Austin attempted to explain his conclusion that the instrumentation caused Mrs. Prohaska's arachnoiditis and fibromyalgia. Dr. Austin surmised that Dr. Simmons *may* have misplaced a screw because when the screws were removed during explantation, one of them was stimulated with "a Bovie," which

caused the leg to jump. Dr. Austin concluded from this reaction "that the end of the screw was outside the cortex of the pedicle in a nerve root or several nerve roots so that's a defect in the placement of the screw...." Item 20, Austin II, pp. 31–32. However, he was "not sure" that Dr. Simmons misplaced the screw. *Id.*, p. 32. Nevertheless, he concluded "the penetration of one of the nerves by the screw all set up a chronic pain syndrome that *could* be described as compatible with fibromyalgia." *Id.*, p. 85 (emphasis added). Dr. Austin's equivocal statements do not comport with the "reasonable degree of medical certainty" standard required to prove causation. "Expert testimony should be excluded if it is speculative or conjectural...." *Boucher v. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996).

Dr. Austin's comments concerning Mrs. Prohaska's fibromyalgia are equally troubling. He testified: "I think that there are some patients that truly have fibromyalgia, and then I think there are others in which there may be some psychogenic problems. I haven't made up my mind totally. I think this woman *probably* has [fibromyalgia]...." (Emphasis added.) Item 20, Austin II, p. 54. Dr. Austin admitted that the doctor who first diagnosed plaintiff's fibromyalgia felt it was a "questionable etiology." He also admitted that no other doctor claimed the implanted internal fixation devices caused Mrs. Prohaska's fibromyalgia. *Id.*, p. 55. He could not point to any medical article or text that connected fibromyalgia with implanted internal fixation devices. *Id.* Dr. Austin's own knowledge of fibromyalgia was limited, since he had never diagnosed a patient with it and admitted that it is a "poorly understood condition" and that some doctors do not believe it is a real diagnosis at all. *Id.*, pp. 53–54.[13] Asked about the objective evidence of Mrs. Prohaska's fibromyalgia, Dr. Austin responded "It's not objective. It's by the fact that you eliminate all other causes that you arrive at that diagnosis, basically." *Id.*, p. 55.

The court finds that not only does Dr. Austin not aver to a reasonable degree of medical certainty that the screw was misplaced, but he equivocates as to whether the chronic pain syndrome arising from the alleged failure of the instrumentation was in fact fibromyalgia.

Concerning the diagnosis of arachnoiditis, Dr. Austin relied on the analysis provided by Dr. Burton's examination of the plaintiff, as well as an EMG study which showed abnormalities that were *compatible* with arachnoiditis. Item 20, Austin II, p. 50. He was not aware of any medical article or text that connects arachnoiditis with implanted internal fixation devices. *Id.*, p. 56.

When stripped to its basic elements, Dr. Austin's differential diagnosis methodology is highlighted in the following exchange:

Q. So the patient says I have back pain. She has implanted devices. Doesn't necessarily follow that the implanted devices are causing the pain, correct?

A. Well, my opinion is that because they're faulty that was the reason she was having the pain.

Q. Well, merely because the patient says she has low back pain and she has implanted devices doesn't necessarily mean that they—that the im-

---

13. The *New York Law Journal*, reporting on "Gatekeeping and Differential Diagnosis" (Mon. Dec. 11, 2000), wrote that "the medical literature acknowledged that the causes of fibromyalgia are unknown," citing *Gross v. King David Bistro, Inc.*, 83 F.Supp.2d 597 (D.Md.2000).

planted devices are causes [sic] the pain, correct?

A. Not necessarily, unless you've done tests and you can't find any other cause.

Austin II, pp. 69–70.

Although he agreed that no medical record showed objectively that, prior to explantation, the C–D device was causing Mrs. Prohaska's pain, Dr. Austin referred to the postoperative MRI that "showed no evidence of ruptured disc, no evidence of spinal stenosis, nothing that would cause pain other than the instrumentation and arachnoiditis, so there was *indirect* evidence" that the device caused her pain. *Id.*, p. 70 (emphasis added).

Lastly, Dr. Austin relied on Mrs. Prohaska's subjective complaints of pain as the basis for his statement that her back and leg pain was worse at the time of deposition than it was prior to the December 1991 operation. *Id.*, p. 42. Courts have noted that simply because pain appeared to increase after implantation does not offer proof that the device caused the pain. "The temporal connection between the two events standing alone is insufficient to prove causation." *Baker v. Smith & Nephew Richards, Inc.*, 1999 WL 1129650 at *3 (N.D.Ga. Sept. 30, 1999).

Particularly damaging to Dr. Austin's qualification as an expert is the manner by which he arrived at his conclusion that the "screws [in the C–D device] had broken," Item 20, Ex. P, p. 1. As the record reveals, the genesis of this opinion was assumption, not medical fact.

During his deposition, Dr. Austin stated he "assumed" that "all" of the screws in Mrs. Prohaska's spine had broken. Austin II, p. 44. He admitted that he did not know when they had broken, had never seen an x-ray showing a broken screw, and was not aware of any evidence that Dr.

Simmons at any time thought that any of the screws he implanted had broken. *Id.*, pp. 44–45. As the source for his statement that the screws had broken, Dr. Austin pointed to a statement made by Dr. Menkowitz in his explant report: "However, the standard technique for Cotrel–Dubousset indicates breaking of the screws, making it impossible to back the screws out." *Id.*, p. 43. Dr. Austin interpreted this statement as meaning that one or more of the C–D screws had broken. Pressed closer by defense counsel, Dr. Austin admitted that Dr. Menkowitz did not actually say that the screws were broken in the pedicles, although he "implied" it. Upon further questioning, Dr. Austin stated, "I'm not sure what he's saying because he isn't clear in his statement." *Id.*, p. 47. Even giving all reasonable inferences to plaintiff, Dr. Austin's skewed interpretation of Dr. Menkowitz's statement strikes at the heart of his reliability as an expert. In his report of the 1991 surgery, Dr. Simmons states that after insertion of the rods and screws, "all of the locking bolts were fully secured down to breaking point and sheared off." Item 20, Exh. H, p. 2. This supports defendants' contention that one of the reasons Dr. Austin misread Dr. Menkowitz's report was due to his unfamiliarity with the C–D system. He did not understand how the screw was attached to the rod (Austin II, p. 47) and that the tops of the screws are sheared off as a matter of course during the implantation procedure. Plaintiffs admit that Dr. Menkowitz's 1991 operative report indicates that "Dr. Simmons had to break off the tops of the screws." Item 35, ¶ 42. This gives further credence to the view that breaking screws was part of the implantation procedure, not a result observed when Dr. Menkowitz explanted the instrumentation.

Concerning the alleged defects in the C–D system referred to in his report, Dr. Austin relied on Dr. Alexander's report for

the proposition that the screws used in Mrs. Prohaska's surgery were too large: "The relatively small diameter of the pedicle and the relatively large outer diameter of the pedicle screws necessary for adequate strength ... make it extremely difficult for even the most experienced and skilled surgeon to reliably place the screws within the pedicle...." Item 20, Exh. J, p. 6. However, Dr. Austin did not know the size of the C–D screws, their length, or range of outside diameters. He had made no assessment of the size of the C–D screws used by Dr. Simmons versus the size of Mrs. Prohaska's pedicles. Item 20, Exh. I, Austin II, pp. 88–89.

Given the above, plaintiffs have not proved by a preponderance of the evidence that Dr. Austin's testimony is reliable. *Moore v. Ashland Chem., Inc.,* 151 F.3d 269, 276 (5th Cir.1998).

### 3. Dr. Alexander

■ Dr. Austin claims that Mrs. Prohaska was injured by "defects" in the screws. As the source for this opinion, he refers to the May 20, 1999 expert report of Harold Alexander, Ph.D. (Item 20, Exh. J), which Dr. Austin cites at length in his May 18, 1999 report. Item 20, Exh. P, p. 2. Plaintiffs have named Dr. Alexander as their second expert causation witness. Although the Judge in the Multidistrict Litigation allowed Dr. Alexander to testify as an expert in orthopedic bioengineering, *i.e.,* "how the human body functionally, but not medically, responds to pedicle screws," he did not allow him to testify in the subsequent individual suits on any medical causation issues. *In re Orthopedic Bone Screw Prods. Liab. Litig.,* 1997 WL 39583, *3 (E.D.Pa. Jan. 27, 1997).

Dr. Alexander's report concerns potential risks of bone screws generally, and cites no specific defect in the C–D screws: "Pedicle screw internal spinal fixation instrumentation, including the CD Spinal System, presents a number of unique risks which make it potentially dangerous." Item 20, Exh. J, p. 6. According to Dr. Alexander, among the risks associated with pedicle screw instrumentation are mechanical device failure, chronic localized inflammation, and the general problem that the C–D device has not been proven safe and effective. *Id.,* pp. 8, 9. The inadequacy of Dr. Alexander's opinion is that "[N]owhere in Dr. Alexander's ... report does he state what is wrong with the ... screws at issue here, an absolute prerequisite...." *Sita,* 43 F.Supp.2d at 256. Defendants have pointed to numerous cases where courts have rejected Dr. Alexander's opinions as insufficient to create a material fact as to whether the product is defective.[14] Item 15, p. 12. Dr. Alexander does not set forth specific facts to satisfy how or why defendants' pedicle screw system is "unreasonably dangerous." His report merely states "[u]ntil this device is adequately tested for pedicular fixation, it must be assumed it is unsafe...." Item 20, Exh. J, p. 9. An assumption proffered by an expert witness is unacceptable under Federal Rule of Evidence 702. *Mancuso,* 967 F.Supp. at 1441.

Interestingly, Dr. Alexander relies on the report of Dr. Austin (Item 20, Exh. J, p. 2), just as Dr. Austin relies on the report of Dr. Alexander. Item 20, Exh. P, p. 2. Dr. Alexander's reliance on Dr. Austin allows him to note that "Ms. Prohaska suffered broken screws in her spinal instrumentation that contributed to her pain and disability...." (Exh. J, p. 8.) Howev-

---

**14.** Dr. Alexander opinion was rejected in other New York cases, including *Sita* and *Lawrence v. Sofamor, S.N.C.*

er, the basis for that remark has been found to be questionable at best, as discussed above. The fact that both experts repeat it underscores the superficial analysis they each have provided based on a review of some records and each others' report.

### 4. Conclusion

The court finds that Dr. Austin is neither qualified as an expert, nor is his methodology reliable. Both Dr. Austin and Dr. Alexander's opinions are not helpful to the court when considering the issue of causation. For the reasons articulated above, defendants' motion to strike the opinion of plaintiffs' expert, Dr. Austin, is granted.

### C. Effect of Exclusion on Plaintiffs' Causes of Action

The exclusion of case-specific expert testimony proffered by Dr. Austin has a profound effect on plaintiffs' causes of action.

#### 1. Count III, Strict Liability, and Count V, Negligence

Because the issues of strict liability and negligence are so interrelated, involving similar inquiries, the court will address them collectively.

#### a. Design defects

Dr. Austin did not discuss design defect, except to the extent that he referred to Dr. Alexander's report. And Dr. Alexander, whose opinion is not credited as being helpful to this litigation,[15] pointed out alleged risks inherent in using a spinal fixation product, including the C–D device. However, a design defect claim

cannot be established simply on the basis of a product's inherent risks. *McCarthy v. Olin Corp.*, 119 F.3d 148, 155 (2d Cir.1997). In addition, plaintiffs have not offered evidence of a feasible, safer alternative design in order to survive summary judgment. *Fane v. Zimmer*, 927 F.2d 124, 128 (2d Cir.1991) (interpreting N.Y. law); *Voss v. Black & Decker Mfg. Co.*, 59 N.Y.2d 102, 108, 463 N.Y.S.2d 398, 450 N.E.2d 204 (1983). Defendants include as Exhibit Q a list of 270 surgeons who regard internal fixation devices as representing the standard of care in the relevant medical community in time frames ranging from 1993 to the present. Dr. Edward D. Simmons, who performed the surgery on Mrs. Prohaska, testified that pedicle screw fixation was "the community standard of care." Item 20, Exh. R, Generic,[16] p. 38.

Plaintiffs have failed to present evidence that the product, as designed, was not reasonably safe or presented an unreasonable risk "of harm [to the user] and feasibly could have been designed more safely." *Fane v. Zimmer*, 927 F.2d 124, 128 (2d Cir.1991). Failure to establish that a product was defectively designed and that the defectively designed product was a substantial factor in causing injury is fatal to plaintiff's claims. *Castle v. Leach Co.*, 4 F.Supp.2d 128, 130 (N.D.N.Y.1998).

#### b. Manufacturing Defect

To prove the existence of a manufacturing defect, a plaintiff must establish that the product was not built to specifications or that it did not conform to the manufacturer's intended design. *Minda v. Biomet, Inc.* (unpublished decision), 182 F.3d 900 (2d Cir.1999). To make out a

---

**15.** Numerous courts have declined to find design defects based upon Dr. Alexander's report. Item 19, p. 22.

**16.** Defendants have included a number of different depositions by Dr. Simmons in Exhibit

R. To distinguish them, the court will adopt defendant's nomenclature: Generic, McClellan, Stevenson, and Woodard.

prima facie case of strict products liability based on a manufacturing defect, a plaintiff initially "may rely upon the circumstances of the accident and proof that the product did not perform as intended." *Brown v. Borruso*, 238 A.D.2d 884, 885, 660 N.Y.S.2d 780 (4th Dept.1997). Still, plaintiff "must submit some direct evidence that a defect existed." *Id.* (citation omitted). Here, plaintiffs offer no evidence for their charges that the device is manufactured with "inadequate materials of construction, inadequate quality control in machining of critical components and poor finishing processes." Item 1, ¶ 63. Conclusory statements are not enough to withstand summary judgment concerning manufacturing defects of the C–D device.

**c. Defective Warnings**

■ Plaintiffs next contend that the warnings, or lack thereof, accompanying the C–D system rendered the product defective. At issue here is the sufficiency of the warning provided plaintiff and plaintiff's surgeon by defendant Sofamor, S.N.C. "Under New York law, a defense is provided against liability for failure to warn when a drug or medical device is 'properly prepared, and accompanied by proper directions and warning.'" *Sita*, 43 F.Supp.2d at 259 (citations omitted). The manufacturer "satisfies its duty by 'warn[ing] of all potential dangers in its prescription drugs that it knew, or, in the exercise of reasonable care, should have known to exist." *Id.*

It is well accepted that product warnings are intended for the physician, "whose duty it is to balance the risks against the benefits of various treatments and to prescribe the treatments he or she thinks best." *Id.* (citation and quotation omitted). The physician's role is that of an " 'informed intermediary' between the manufacturer and the patient." *Martin v.*

*Hacker*, 83 N.Y.2d 1, 9, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993). Therefore, "the manufacturer's duty to caution against a drug's side effects is fulfilled by giving adequate warning through the prescribing physician, not directly to the patient." *Id.* As is the case with prescription drugs, "[T]he manufacturer of a medical device does not have a duty to directly warn a patient of risks associated with the device, but instead discharges its duty by providing the physician with sufficient information concerning the risks of the device." *Sita*, 43 F.Supp.2d at 259.

Under the learned intermediary doctrine, the defendant manufacturer had an obligation to inform Dr. Simmons, not Mrs. Prohaska, of the risks of using pedicle screws. "If the doctor is sufficiently warned, the product is not defective.... Nor is a manufacturer responsible for how a learned intermediary conducts his business." *Lawrence v. Sofamor, S.N.C.*, 1999 WL 592689 *4 (N.D.N.Y. Aug. 2, 1999) (citations omitted).

Clearly, Dr. Simmons is a learned intermediary. As a Board-certified orthopedic surgeon, he has authored numerous articles on spine surgery, both with and without instrumentation. Item 20, Exh. S. One of his articles concerned adult scoliosis in which pedicular fixation devices, including the C–D device, were discussed. Item 20, Exh. T. He was an FDA investigator for a study concerning another internal fixation device. Item 20, Exh. R, pp. 15–17. Dr. Simmons has been performing spinal fusion surgeries since 1982, and began using pedicle fixation in the early to mid–1980s. *Id.* at 20–22. He testified that pedicle fixation in the lumbar spine is an essential part of the treatment option for patients and in certain cases is markedly superior to anything else available. *Id.*, p. 18.

Plaintiffs provide an illegible copy of the package insert from "the modified CD de-

vice which was implanted into Ms. Prohaska" as Exhibit 31. Defendants have also offered the same exhibit as Exhibit 5 attached to the Verified Statement of Brian Gooden, Regulatory Manager for Sofamor, S.N.C. Item 20, Exh. F.

Plaintiffs bear the burden of proving that any alleged failure to warn Dr. Simmons was the proximate cause of Mrs. Prohaska's injuries. Assuming that the writing on the insert refers to risks associated with implantation of the device, the warning must "provide sufficient information to that category of prescribing physicians who may be expected to have the least knowledge and experience with" the product. *Martin v. Hacker*, 83 N.Y.2d 1, 9, 607 N.Y.S.2d 598, 628 N.E.2d 1308 (1993). Because plaintiffs have provided only conclusory statements that the warnings were inadequate, and no evidence concerning the insufficiency of the warning, they cannot defeat summary judgment.

Moreover, a "treating physician's decision not to inform a patient of the risk of injury is an intervening cause, which severs any causal connection between the patient's injury and the manufacturer." *Krasnopolsky v. Warner–Lambert Co.*, 799 F.Supp. 1342, 1347 (E.D.N.Y.1992) (citing *Glucksman v. Halsey Drug Co.*, 163 A.D.2d 163, 160 A.D.2d 305, 553 N.Y.S.2d 724 [1st Dept.1990] ). Mrs. Prohaska did not sue Dr. Simmons on a failure-to-warn cause of action. Dr. Simmons testified during deposition that he was aware of the risks from implantation, including that the sacrum or vertebrae could fracture during or following surgery; that a nerve could be touched or damaged by the screws; and that there could be infection or allergic reaction. He admitted that parts of the instrumentation could break due to metal fatigue, that screws could become loose due to excess physical activity or the manner in which the device was assembled,

that the instrumentation might have to be removed in a subsequent surgical procedure, and that the operation might not accomplish its objective and the pain would recur. Item 20, Exh. R, Woodward, pp. 39–42. His practice was to inform patients about the operation. Item 20, Exh R, Generic, pp. 59, 62, 63. Plaintiffs have not put forth evidence to show that any alleged inadequacy in the warning was a proximate cause of Mrs. Prohaska's injuries.

Absent competent medical expert testimony on the issue of causation, plaintiffs cannot prove the elements of a cause of action based in strict products liability or negligence. For all the above reasons, summary judgment is granted on plaintiff's strict liability and negligence causes of action.

## 2. Count I: Fraudulent Marketing and Promotion

Count One of the complaint alleges fraudulent marketing and promotion of pedicle screws. It charges that Sofamor prepared and distributed videotapes, technique manuals, and catalogs describing the clinical use of the C–D device as a pedicle screw fixation device. Item 1, ¶ 46. Sofamor represented that the C–D device was safe and effective. *Id.*, ¶ 48. Plaintiffs claim that these representations to surgeons and patients were false, and materially and intentionally misleading. *Id.* They allege that these defendants caused physicians to appear at various symposia in which spine surgeons received "instruction" in pedicle screw fixation with the C–D device (*id.*, ¶ 47); and that plaintiff's surgeon relied on the misleading misrepresentations which caused plaintiff's injury. *Id.*, ¶¶ 51, 52. Also included among the alleged misrepresentations was a charge that Sofamor failed to disclose that the FDA refused to clear or approve the C–D

device for commercial distribution as a pedicle fixation device. *Id.,* ¶ 49.

Plaintiffs have characterized Count I as a "Fraud on the FDA" cause of action. However, due to the stipulation signed on March 10, 2000 in which the parties agreed that the only causes of action were those claimed in the complaint and the complaint contains no "Fraud on the FDA" cause of action, the court discounts all of plaintiffs' arguments concerning that characterization of its claim.

■■■ The Fraudulent Marketing and Promotion claim fails because plaintiff has not detailed the circumstances of the alleged fraudulent promotion with the specificity required by Fed.R.Civ.P. 9(b): "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

The Second Circuit "has explained that Rule 9(b) requires a plaintiff to '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent'." *Loewy v. Stuart Drug & Surgical Supply, Inc.,* 1999 WL 76939 at *5 (S.D.N.Y. Feb. 11, 1999) (citing *Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993)).

Plaintiff has failed to meet her burden. "Plaintiff does not extract quotes from the relevant materials, provide copies of the offending documents, state where and when any misleading materials were distributed, refer to particular individuals who made misleading statements to doctors and patients, or detail when and where those misleading statements may have been made." *Id.*

■■■ Further, to succeed on a claim of fraud, a plaintiff must establish reliance upon a false statement or material misrepresentation or omission. *King v. Cross-*

*land Savings Bank,* 111 F.3d 251, 257–58 (2d Cir.1997). Moreover, "a plaintiff does not establish the reliance element of fraud for purposes of New York law by showing that only a third party relied on defendant's false statements." *Lawrence,* 1999 WL 592689 at *5 (citations omitted). Again, there is no proof of a specific false statement or an intentionally false statement made by Sofamor upon which either plaintiff or Dr. Simmons relied in electing to perform surgery using the C–D device. Plaintiff testified she never discussed the instrumentation with Dr. Simmons prior to surgery, and that she did not know the identity of the manufacturer before surgery. Item 20, Exh. C, pp. 210–215, 224. Clearly, Mrs. Prohaska did not rely on any representations, no less misrepresentations, made by Sofamor.

Plaintiffs' papers make much of the fact that vertebral screws, such as those implanted in Mrs. Prohaska, were not approved for use in the pedicles by the FDA. Plaintiffs charge that Sofamor was not permitted to market its vertebral screws to doctors such as Dr. Simmons for attachment to the lumbar pedicles at the time of Mrs. Prohaska's 1991 surgery. Plaintiff's Memorandum of Law cites at length the testimony of Dr. David West, Sofamor's regulatory expert. Item 30, Pages 13–16. However, plaintiffs have failed to connect Dr. West's general comments concerning Sofamor's marketing and promotion with any reliance exhibited by plaintiff or by Dr. Simmons.

Plaintiffs have provided no proof of a specific false statement made by defendants upon which Dr. Simmons relied in electing to perform surgery using the C–D device. Dr. Simmons testified that when he talked to "reps at meetings, they would say that the companies were not allowed to have anything in their literature, per se, because they said this wasn't FDA ap-

proved for them to do so...." Item 20, Exh. R, Generic, pp. 37–38. In deciding whether to implant pedicular fixation devices, and which device to implant, Dr. Simmons has always made an independent medical judgment. Item 20, Exh. R, Woodard, pp. 31–32. He has never decided to use pedicular fixation based upon anything told to him by a representative of a professional organization or an employee of a particular seller of fixation devices. *Id.*, p. 32. He has not received information from Sofamor or any other manufacturer discussing or recommending pedicular fixation with screws. Item 20, Exh. R, Generic, p. 37. Lastly, Dr. Simmons strongly believed in the merits of internal fixation with screws. Item 20, Exh. R, Woodard, pp. 18, 38. He regarded pedicle screw fixation as "a major advance in spinal surgery, and for some problems, it's also an essential ... part of the treatment of the patients." Item 20, Exh. R, Stevenson, p. 18. He cited not only the higher success rate in achieving fusion and quicker recovery, but also patients' savings on hospital bills, as recommending this form of surgical intervention. Item 20, Exh. R, Generic, pp. 23–24, 28–29. In denying a similar count in *Sita*, the trial court found:

> Given Dr. Weber's academic qualifications and teaching positions, a jury could not credibly accept, as a jury must for plaintiff's counsel's theory to hold up, that Dr. Weber was unaware of developments in his field, and that he not only learned what he knew of using spine screws in the pedicles of the spine substantially because of Danek's alleged marketing efforts, but that he continued to use screws for pedicular applications because of Danek's subtle promotion.

*Id.* at 264.

Accordingly, defendants' motion for summary judgment on plaintiff's claim for fraudulent marketing and promotion is granted.

### 3. Count II: Negligent Misrepresentation

■ Count 2 of plaintiff's complaint, Negligent Misrepresentation and/or Strict Liability set forth in the *Restatement of Torts (Second)*, Section 402(b), alleges that defendants failed to exercise reasonable care to assure that the representations they made concerning the safety and effectiveness of the C–D device were accurate, truthful, and not misleading. Plaintiffs claim that as a result of those representations, (a) plaintiff's surgeon implanted the device, and (b) plaintiff suffered physical harm.

Similar to the claim above, in order to succeed on a claim of negligent misrepresentation, a plaintiff must establish reliance upon a false statement or material misrepresentation or omission. *Sita*, 43 F.Supp.2d at 260. Under New York law, the alleged misrepresentation must have been made by the defendant to the plaintiff. *Cement & Concrete Workers Dist. Welfare Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir.1998). As discussed *supra*, Mrs. Prohaska did not rely upon any representations or misrepresentations made by Sofamor. In addition, since only a doctor can prescribe and use the C–D system, any reliance on Sofamor's statements that Mrs. Prohaska could possibly claim is eliminated by the learned intermediary rule. Also, as indicated above, Dr. Simmons did not rely upon any statements by defendants in recommending and performing surgery with the C–D device.

■ Plaintiffs have offered no proof of reliance by Mrs. Prohaska, or by Dr. Simmons, an experienced spine surgeon, on any misrepresentations proffered by defendants. Therefore, this claim must fail. In addition, "[b]ecause New York has nev-

er adopted the strict liability approach set forth in Section 402B of the Restatement," that portion of Count 2 must be stricken. *Loewy*, 1999 WL 76939 at *6 (citing *Micallef v. Miehle Co.*, 39 N.Y.2d 376, 384 N.Y.S.2d 115, 122, 348 N.E.2d 571 (1976)).

### 4. Count IV: Liability Per Se

 Count Four of plaintiffs' complaint alleges liability per se, and charges that defendants violated the Food, Drug and Cosmetic Act (FDCA), 21 U.S.C. § 301 *et seq.*, and the Medical Device Amendments to that Act (MDAs), 21 U.S.C. § 360, *et seq.* These statutes had been enacted to protect the plaintiff and persons in her position from " 'increasingly complex devices which pose a serious risk if inadequately tested or improperly designed or used;' " and as a proximate result of these violations, plaintiff was injured. Item 1, ¶¶ 78, 81. The medical device at issue in this litigation is subject to regulation by the FDA pursuant to the FDCA and MDAs.

 New York law holds defendants liable for negligence per se if the following factors are satisfied: (1) the plaintiff is among the class of people for whose particular benefit the statute had been enacted; (2) recognition of a private right of action would promote the legislative purpose behind the statute; and (3) creation of the right would be consistent with the overall legislative scheme. *Loewy* at *4, citing *Gain v. Eastern Reinforcing Serv. Inc.*, 193 A.D.2d 255, 603 N.Y.S.2d 189, 191 (3d Dept.1993). Also, under New York law, a cause of action exists under negligence per se when the underlying claim is for misbranding or otherwise illegally omitting product warnings required by the FDCA. A violation of a statute or regulation may serve as the basis for negligence per se. *Lawrence v. Sofamor* at *6 (citing *Ezagui v. Dow Chemical Corp.*, 598

F.2d 727, 733 [2d Cir.1979] ). Further, proof of such a violation "may constitute negligence per se, and if such violation is the proximate cause of the injury, liability is established." *Id.*

The evidence presented by the plaintiffs has been extensively reviewed, and there is nothing to indicate that defendants have violated any provision of the FDCA.

What is more, as in other causes of action, plaintiffs have been unable to establish proximate cause, an indispensable element to this claim. Consequently, plaintiffs have not established a claim for negligence per se, and the claim is dismissed.

### 5. Count VI: Breach of Implied Warranty of Merchantability

 Count Six of plaintiffs' complaint alleges that:

By intentionally promoting and knowingly selling the C–D device for use as a pedicle screw fixation device, [defendants] impliedly warranted to Plaintiff and to Plaintiff's implanting physician that it was merchantable, that it was proven safe and effective for pedicle screw fixation, that it was properly labeled, that it contained proper instructions for its intended use as a pedicle screw fixation device and that the commercial distribution of the device ... was in compliance with all applicable laws, regulations and ordinances.

This implied warranty extended to Plaintiff as the ultimate consumer and user of the C–D device.

Item 1, ¶¶ 94 & 95.

 If a seller is a merchant, there is an implied contract that the goods will be of merchantable quality. *Conductores Monterrey, S.A. de C.V. v. Remee Products Corp.*, 2000 WL 1448609 at *8 (S.D.N.Y. Sept. 28, 2000). Plaintiff must

provide evidence that something was wrong with the product, a necessary factor in warranty claims. *McCarthy v. Olin Corp.*, 119 F.3d 148 (2d Cir.1997). In a "breach of implied warranty action, the inquiry is not whether there were safer designs available, but whether the product was 'fit for the ordinary purposes for which such goods are used.'" *Groome v. Matsushita Electric Corp. of America*, 2000 WL 341134 at *6 (E.D.N.Y. Mar. 30, 2000) (citation omitted). This inquiry "focuses on the expectations of the product's performance when used in the customary, usual, and reasonably foreseeable manner." *Id.* Where the goods are "doing what they were supposed to do for as long as they were supposed to do it, [they] clearly [lived] up to that 'minimum level of quality' which is all U.C.C. 2–314(2)(c) requires." *Id.* at 603. Finally, the goods do not have to fulfill every expectation of the buyer. *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258 n. 4, 639 N.Y.S.2d 250, 662 N.E.2d 730 (1995).

Having found, *supra*, that the C–D device was not defective, and that plaintiffs have not provided proximate causation evidence to survive summary judgment, this claim also fails. Dr. Austin conceded that a solid fusion had been obtained, which is the function the device was expected to perform.

### 6. Count VII: Loss of Consortium

 A spouse's claim for loss of consortium is derivative of the other spouse's cause of action. *Larkins v. Glaxo Wellcome Inc.*, 1999 WL 360204 at *8 (E.D.N.Y. May 20, 1999) (citations omitted). The loss of consortium claim does not exist "in the common law independent of the injured spouse's right to maintain an action for injuries sustained." *Id.* Plaintiff Thomas Prohaska's derivative claim for loss of consortium obviously fails in light of plaintiff Donna Prohaska's inability to establish any actionable conduct on the part of the defendants. Accordingly, defendants' motion for summary judgment is granted on this claim.

### CONCLUSION

For the foregoing reasons, it is hereby ordered that defendants' motion to strike the opinion of plaintiffs' expert, Dr. Austin, is granted and that the defendants' motion for summary judgment is granted. The Clerk of the Court is directed to enter judgment in conformity with this opinion.

So ordered.